

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF
### ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>Nick Wurl,<br>Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CR. NO. 15 CR 306 |

**FILED**

MAY 0 6 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### DEFENDANT NICK A. WURL'S MOTION TO DISMISS INDICTMENT
### FOR SELECTIVE PROSECUTION, EGREGIOUS PROSECUTORIAL
### MISCONDUCT

UNITED STATES OF AMERICA

v.

NICK WURL

15CR306

DEFENDANTS MOTION TO DISMISS THE INDICTMENT ON THE GROUNDS THAT THE UNITED STATES ATTORNEY AND AFFILIATED PARTIES ARE SELECTIVELY PROSECUTING MR. WURL IN VIOLATION OF THE EQUAL PROTECTION AND DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Defendant Nick A. Wurl hereby moves this Court, pursuant to Federal Rule of Criminal Procedure 12(b) to dismiss the indictment with prejudice.

The Indictment charges that Mr. Wurl, in violation of 18 U.S.C. 1343:

Devised, intended to devise, and participated in a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises...

This motion is based upon: this notice of motion and the points and authorities incorporated herewith; all other pleadings, records, and files herein; and such evidence and argument that may be presented at the hearing of this motion.

Mr. Wurl respectfully requests oral argument on this motion. A proposed Order is attached.

Respectfully submitted

NICK WURL
Pro-Se Litigant

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT ON THE GROUNDS THAT DEFENDANTS MOTION TO DISMISS THE INDICTMENT ON THE GROUNDS THAT THE UNITED STATES ATTORNEY AND AFFILIATED PARTIES ARE SELECTIVELY PROSECUTING MR. WURL IN VIOLATION OF THE EQUAL PROTECTION AND DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ON THE GROUNDS OF PROSECUTORIAL MISCONDUCT WHICH UNFAIRLY PREJUDICED THE DEFENDANTS AND WILLFULLY DECEIVED THE COURT.

The Indictment in this case charges Mr. Wurl with Wire Fraud in violation of 18 U.S.C. § 1343. Specifically, the Government alleges that Mr. Wurl devised, intended to devise, and participated in a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises. Mr. Wurl herein incorporates all facts known to the court in this statement of the case.

I.   FACTUAL BACKGROUND

    A .  This case arises out of Mr. Wurl's association with Ludiera Capital. Mr. Wurl

        herein incorporates all facts and documents known to the court as the Factual

        Background for this case.

II.   ARGUMENT

The pending charge of Wire Fraud must be dismissed because Mr. Wurl is being

selectively prosecuted in violation of the federal equal protection clause and due

process guarantees. (U.S. Const., Amends. V, XIV.) The evidence presented with this

motion establishes that Mr. Wurl was singled out for prosecution based upon arbitrary

classifications including but not limited to age, economic status, and affiliation with or

connection to Government entities and employees. Further, in pursing this case, the

Prosecutor, Department of Justice and/or other affiliated persons have engaged in

egregious misconduct which is prejudicial against Mr. Wurl.

      The central principle of America's founding was that the rule of law would be the

prime equalizing force, the ultimate guardian of justice, however, increasingly,

America's political and business establishment has presided over a series of

extraordinary crimes that has contributed to a period of financial hardship for many

households within the United States but that for which little to no legal consequence is

assigned. Recent settlements with organizations suggest that political and financial

elites have actually secured immunity when they knowingly break the law under the

guise reported as 'Too Big to Jail'. The notion that financial elites are awarded virtual

immunity from criminal prosecution for statutes that are enforced vigorously against

less affluent individuals and organizations is not just a departure from the rule of law but a fundamental repudiation of it.

The founders of the United States of America considered vast inequality in every other realm to be inevitable and even desirable – some would be rich and many would be poor. Some will acquire great power and many would conduct their entire lives with little to no power. Due to these unavoidable circumstances, the American conception of liberty was not only consistent with, but premised on, the inevitability of outcome inequality – the success of some people, the failure of others.

To this notion of inequality, there is one exception: When it comes to the law, no inequality is tolerable. Law was understood to be the sine qua non ensuring fairness, a level playing field, and a universal set of rules. It was the non-negotiable prerequisite that made all other forms of inequality acceptable. Only if everyone was bound to the same rules would outcome inequality be justifiable.

In the words of John Adams, we are "a nation of laws, not men". In his 1776 *Thoughts on Government*, Adams put the rule of law at the top of his list of core principles for a fee and legitimate government. In the absence of the rule of law, good government cannot be said to exist. In 1798, Thomas Jefferson wrote, "In questions of power, then, let no more be heard of confidence in man, but bind him down from mischief by the chains of the constitution." The founding fathers in forming the Constitution of the United States of America seemed to agree: though the rule of law is not sufficient by itself to ensure a just and free society, tis absolutely necessary for it and the fundamental requirement of the rule of law is equality: the uniform application

of a set of preexisting rules to everyone, including the rulers. The Demand that all be treated equally under the law was no secondary concept to the founding of the United States, but its crux.

The law itself wields tremendous power. The legal system's reach is unparalleled: it can deprive a person of property, liberty, even life. It may compel people to transfer their material goods to others, block them from engaging in planned actions, destroy their reputations, even consign them to cages. Unequal application of the law is thus not merely unjust in theory but devastating in practice. When the law is wielded only against the powerless, it ceases to be a safeguard against injustice and instead becomes the primary tool of oppression.

In his 1795 essay *Dissertations on First Principles of Government,* Thomas Paine thus insisted that the only true basis of representative government is equal protection of law to all citizens: rich and poor, strong and weak, powerful and powerless, landowner and tenant. Without equal application of the laws, Benjamin Franklin warned in his 1774 *Emblematical Representations,* society would fracture into two tiers: the "favored" and the "oppressed", a phenomenon that appears very much to be the case today.

Ultimately, the founding fathers envisioned a system of laws under which the poorest laborer stood on equal ground with the wealthiest billionaire; and generally on a more favored basis whenever their rights seem to jar (Jefferson, *Answers to Monsieur de Meusnier's Questions*; 1786). The notion of law simply makes no sense and has no good purpose unless all are equally bound by and subject to its dictates.

In fact, Thomas Paine suggested that a system of legally enforced inequality would enable the elite to exploit the law to entrench unearned prerogatives and to shield ill-gotten gains. It requires very little creativity to draw parallels between this notion of legally enforced inequality and the cases of today.

The above principles form the very basis for the Constitution of the United States of America. These principles have been enshrined as core values to our nation through amendments to the constitution, yet today there are substantial deviations from the principle of the Rule of Law and Equal Protection Under Law.

The People's discretion to prosecute and what to charge is constrained by, among other principles, "the equal protection component of the Due Process Clause of the Fifth Amendment." (United States v. Armstrong (1996) 517 U.S. 456, 464; People v. Superior Court (*Baez*) (2000) 79 Cal.App.4th 1177, 1188; Baluyut v. Superior Court (1996) 12 Cal.4th 826, 831-832.) "The defect lies in the denial of equal protection to persons who are singled out for a prosecution that is 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' Although there is no right to violate a governmental statute, there is a right to equal treatment in the enforcement of the statute. The people's will is frustrated by the fact that laws are enacted to be enforced across the board, and, when laws cease to be equally enforced, they probably should not be perpetuated- a phenomenon reinforced by countless articles examining the audacious lack of personal accountability in cases related to and occurring during the Global Financial Crisis- despite clear culpability and acknowledgement of wrongdoing. In Cox v. Louisiana, 379 U.S. 536, 557-558 (1965), the

Court stated that, "it is clearly unconstitutional to enable a public official to…engage in invidious discrimination among persons or groups by the use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute."

To succeed on a claim of discriminatory prosecution, a defendant must show that others, similarly situated, have not been prosecuted. Once the first element has been shown, under the Berrios test for discriminatory prosecution, the defendant must prove that in addition to being singled out, he or she was singled out for prosecution invidiously or in bad faith. To satisfy the first condition, the defendant must allege and offer evidence tending to show that the government, aware of others committing the same or similar offenses as the defendant has not prosecuted those others, but has "singled out" the defendant or a class of defendants for prosecution. To satisfy this requirement, governmental or prosecutorial knowledge of the other violators appears to be crucial to the defense. Similarly, evidence that another person previously committed the same crime and was not prosecuted will not support the claim. In addition to showing that others have committed the same crime or have engaged in similar conduct, evidence must be presented that they are not being and have not been prosecuted.

To satisfy the requirement of a strong showing that others similarly situated and engaging in the same or similar conduct have not been prosecuted, the defendant offers a number of cases occurring within the past 20 years as a supplement to this motion. Perhaps most notable are civil complaints filed against Fannie Mae and Executives of

Fannie Mae in the time period relevant to Case Number 1:06CV00959 which alleges, among other things, fraudulent reporting of company results by management for the purpose of securing performance based incentive payments to which they otherwise would not have been entitled. Given the broad nature of the wire fraud statute, executives that intentionally issued or caused to be issued materially false statements with regard to the company's financial position for their own personal gain under in-place performance based incentive payments are, in fact, in violation of the statute. Restatement of financial statements to account for and correct Management's materially false presentation of company earnings resulted in a reduction in the Market Capitalization of the company in excess of $30 billion. A mere 5 years later, Fannie Mae Executives are again liable for violation of the wire fraud statute for presenting, yet again, a materially false image of the company's activities and financial soundness as it relates to its purchase of and exposure to "subprime" loans (Case Number 11 CV 9202). Fannie Mae's exposure to "subprime" quality loans that was not declared to investors, and in fact, adamantly declared against, ultimately resulted in forced government conservatorship of both Fannie Mae and Freddie Mac and a sustained (to this day) loss to shareholders in excess of $200 billion.

Though the Fannie Mae Cases are perhaps the most interesting given their direct correlation to the activities alleged in 15CR306 and the fact that some executives are named in both cases, there are far more cases in which individuals were not criminally charged despite violations of United States Statutes. Another noteworthy case is the SEC civil complaint against Goldman Sachs and Fabrice Tourre (case number 10 CV 3229) in

which the SEC alleges that the defendants made materially false and misleading statements and omissions in connection with a synthetic collateralized debt obligation that the defendants structured and marketed to investors. None of the individuals in these cases were subject to criminal charges of any kind, despite actions and behaviors that fall squarely within the wire fraud statute. That the statute of limitations has run its course on these potential cases serves to substantiate that these cases have not, are not and will not be prosecuted.

Under the Berrios test for discriminatory prosecution, once the first element has been shown- that others, similarly situated, have not been prosecuted- there still remains the second element. A defendant must prove that in addition to being singled out, he or she was singled out for prosecution invidiously or in bad faith. In other words, the defendant must show that the prosecution was based on either an impermissible consideration such as race, religion, nationality, or, perhaps most relevant to this case another arbitrary classification. Given the nature of the defendant in this case and compared to the nature of would be defendants in the cases mentioned above, several arbitrary classifications become apparent, not the least of which is the difference in the age of the defendant and would be defendants, the socioeconomic class of the defendant and would be defendants, and the political affiliation or lack thereof of the defendant and would be defendants. For an arbitrary classification to be permissible, it must be justified by a compelling state interest (Korematsu v. United States, 323 U.S. 214, 216 (1944)) however, it is virtually impossible to find any interest that will justify the state's imposition of an inherently suspect, arbitrary classification. The general rule

for a defendant to prevail on a challenge to a prosecution appears to be that he or she must show not only that others similarly situated have not been prosecuted, but also that the classification of those prosecuted and those not prosecuted is an impermissible one. Though the argument presented in this motion is not as much based on an impermissible classification enumerated in the traditional equal protection analysis – save for perhaps a liberal application of the age discrimination act – other classifications must be shown to be unreasonable. It is for this purpose that we once again must reference the ideas upon which the United States was founded – the rule of law and equal protection under law for all citizens, rich and poor. The initial analysis in this document substantiates that the notion of discriminatory prosecution of those in different socioeconomic classes is in fact an unreasonable arbitrary classification upon which criminal prosecution can be undertaken.

Of course, in this case, the considerations which lend themselves to suggest prosecution which was undertaken in bad faith are often combined, arguments to substantiate this claim will attempt to substantiate the validity of the arbitrary classifications upon which the prosecution of 15CR306 was undertaken as a whole. Further, a strong inference of invidious prosecution can be drawn from the materially false and misleading prejudicial statements issued by the prosecutor to the media, discussed in further detail below with exhibits provided in the Prosecutorial Misconduct Section of exhibits following this motion.

Though only a limited subset of cases presenting similarly situated individuals was presented in this discussion, a cursory glance at civil court records in the finance

industry reveals that, as a whole, only civil actions were taken against individuals who are significantly older and of a higher socioeconomic standing. Though it would be impossible to qualify with direct evidence, one could easily draw a parallel between the average age of prosecutors – including prosecutors in this case - and would be defendants in civil cases for which a criminal action could have also been taken but that was not pursued (including but not limited to the cases mentioned in passing above) taken in contrast to the age of Mr. Wurl. Further, in a direct repudiation of the idea of equal protection under law and the Rule of Law, the socioeconomic class of Mr. Wurl as a defendant in 15 CR 306 as compared to the would be defendants in other cases of similarly situated individuals including but not limited to the cases mentioned above is an egregious violation of the notion that all men- whether the poorest tenant or the wealthiest landowner- are equal under law. To some extent, this notion is easier to quantify given the magnitude and structure of civil penalties assigned to organizations in lieu of charges against individuals responsible for the actions that resulted in said civil penalties given that in the class of would be defendants, parent organizations often have the wherewithal to make significant payments of which the Government is often a beneficiary-whereas no such relationship exists for the defendants in 15CR306- despite the fact that a significant portion of civil fines is borne not by the offenders themselves, but rather by the shareholders of the organization in violation of the statute(s). To a lesser extent, but worthy of consideration, is the difference in the political connections and contributions of 'offender' organizations. Most notably, the relationship between some government offices and employees and executives of private sector executives

and employees. Among the most notable conflicts of interest apparent in this arbitrary classification is Timothy Geithner, Former Treasury Secretary who vigorously argued on behalf of 'offender' organizations for softer penalties including but not limited to a general lack of criminal prosecution of individual offenders and Eric Holder, Former Attorney General for the United States who was, prior to and directly after his post as AG, employed at a private law firm whose clients include the firms for which he argued relaxed prosecution was appropriate. Coincidentally, both Geithner and Holder have since returned to private industry and reaped rewards from the organizations they vigorously defended. Further documentation of these relationships is presented in the exhibits following this motion.

In light of the presence of what could arguably be considered kickbacks for considerations that occurred in the professional capacity of both Timothy Geithner and Eric Holder, one must consider the impermissible classifications suggested internally by the United States Department of Justice- one or more of which appears to have a significant correlation to the lack of prosecution of similarly situated individuals in other financial companies: (a) the person's race, religion, sex, national origin, or political activities and beliefs; (b) his own personal feelings concerning the person, the person's associates or the victim; and (c) the possible effect of his decision on his professional personal circumstances. Indeed, it appears as if the decision to decline to prosecute well connected similarly situated individuals may have been influenced at least in part, by the considerations available to Justice Officials from the private sector.

To further advance the claim of egregious prosecutorial misconduct and provide further support for the second element of the Berrios test, there is substantial evidence of invidious prosecution given materially false and misleading statements issued or caused to be issued by the prosecutor and/or affiliated parties or persons to the media (See Prosecutorial Misconduct - an exhibit to this motion) that are materially false, prejudicial, and in violation of Model Rules of Professional Conduct set forth by the American Bar Association, particularly Rule 3.6 (A), (C), (D); Rule 3.8 (F); and Rule 8.4 (A), (C), and (D). This Court should invoke its supervisory power to dismiss the indictment for outrageous prosecutorial misconduct which unfairly prejudiced the defendants and willfully deceived the court. The supervisory power of this Court "include[s] the power to impose the sanction of dismissal with prejudice [] in extraordinary situations [] where the government's misconduct has prejudiced the defendant." United States v. Welborn, 849 F.2d 980, 985 (5th Cir. 1988). Cf. Bank of Nova Scotia v. United States, 487 U.S. 250, 261, 108 S.Ct. 2369 (1988); United States v. Mechanik, 475 U.S. 66, 78, 106 S.Ct. 938, 945-46 (1986) (O'Connor, J., concurring); See also Ramming, 915 F. Supp. at 869 (dismissing based on prosecutorial misconduct); United States v. Martin, 480 F. Supp. 880, 885 (S.D.Tex. 1979) (Dismissal for prosecutorial misconduct; "It is well settled that federal courts have a supervisory function over criminal cases ... to insure that prosecutions are conducted fairly.")[1]

---

[1] Further, in the event that the Department of Justice fails to take the appropriate course of confessing error, dismissing this indictment in its entirety, the defendant does not waive his right to discovery of communications between all involved parties that resulted in the probative and prejudicial statements referenced in this paragraph.

Conclusion

For the reasons stated herein, Mr. Wurl respectfully requests oral argument on

this motion and/or dismissal of all pending charges with prejudice based on the facts

known to the court at this time.

Dated: May 6, 2016

Nick A. Wurl

Pro-Se Litigant

Chicago, Illinois

618.322.6993

EXHIBITS FOLLOW THIS PAGE

Documents presented as Exhibits in order of their appearance:

1. 2006 SEC Complaint against Fannie Mae
2. OFHEO Summary – Special Examination of Fannie Mae
3. 2011 SEC Complaint against Fannie Mae Executives
4. 2011 SEC Complaint against Freddie Mac Executives
5. 2011 Fannie Mae Non Prosecution Agreement
6. 2011 Freddie Mac Non Prosecution Agreement
7. Summary of Facts – 2006 Fannie Mae, 2006 & 2011 Fannie Mae and Freddie Mac, Global Financial Crisis
8. 2010 SEC Complaint against Goldman Sachs & Co and Fabrice Tourre
9. ProPublica Article Demonstrating knowledge of but failure to refer for prosecution, collusion.
10. Commercial and Investment Bank Political Contributions 1990 to 2016
11. CNBC Article detailing bank fines, Global Financial Crisis Era through 10/30/2015
12. New York Times Article detailing moral hazard in that shareholders pay the vast majority of civil penalties against banks
13. Frontline Article detailing that the DOJ does not employ all available resources to identify culpable individuals in fraud at large institutions.
14. Transcript of NPR broadcast detailing an exchange between Dave Davies, Louise Story on why prosecutors don't go after individuals on Wall Street, details individual elements of corruption, Particularly Geithner on p.11.
15. New York Times Article – In Financial Crisis, no Prosecutions of Top Figures
16. Public Citizen Report : Justice Deferred – the Use of Deferred and Non-Prosecution Agreements in the Age of "Too Big to Jail"
17. Rigged Justice – Report by Senator Warren – How Weak Enforcement lets Corporate Offenders off Easy
18. WSJ Article detailing Senate Banking Testimony by Senatory Elizabeth Warren, et. al. faulting Banking Regulators and the DOJ for the lack of Criminal Prosecutions.
19. ProPublica Article detailing testimony with Ex-DOJ Official, prosecutions are "too hard".
20. The Intercept: Eric Holder defends record of not Prosecuting Financial Fraud
21. Bloomberg View: The case of the missing White Collar Criminal
22. Hoover Institution: When our Government Commits Fraud – Fraud with respect to conservatorship and the third amendment of GSEs Fannie Mae and Freddie Mac.
23. Reuters Article: Wells Fargo Admits Deception in $1.2 Billion Mortgage Settlement.
24. Bloomberg Article: Wells Fargo Named Primary Dealer for U.S. Debt by New York Fed (one week after admitting deceiving U.S. Government in 1.2 Billion Mortgage Settlement)
25. Rolling Stone Article Detailing Eric Holder and failure to hold individuals on Wall Street accountable; also: details conflict of interest between pre-and post DOJ position at Covington & Burling.
26. Bloomberg Article detailing line of credit Geithner received to jump start his career in private equity. Note: Geithner argued aggressively for a soft stance on Wall Street Violations.

27. Binder detailing false statements made by the prosecutor and/or affiliated persons to media and the applicable ABA Model Rules that prohibit such conduct.

### UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** 100 F Street, NE Washington, DC 20549, | : : : : : |
| Plaintiff, | : : |
| v. | : : |
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION,** 3900 Wisconsin Avenue, NW Washington, DC 20016, | : : : : |
| Defendant. | : : : |

CASE NUMBER  1:06CV00959

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 05/23/2006

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1.      The Federal National Mortgage Association ("Fannie Mae," or the "Company") engaged in a financial fraud involving multiple violations of Generally Accepted Accounting Principles ("GAAP") in connection with the preparation of its annual and quarterly financial statements. These violations had the effect, among other things, of falsely portraying stable earnings growth and reduced income statement volatility and – for year-ended 1998 – of maximizing bonuses and achieving forecasted earnings. Between 1998 and 2004, Fannie Mae, a shareholder-owned government-

sponsored enterprise, misstated its results of operations and issued materially false and misleading financial statements in various reports and in filings with the Commission.

2.     The Company's misconduct took varied forms. In some instances the Company acted negligently, and in other instances intentionally or recklessly. At the end of 1998, senior management manipulated the Company's earnings in order to obtain bonuses they would otherwise not have received, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

3.     In other periods, the Company's accounting was inconsistent with GAAP, in violation of Sections 17(a) (2) and (3) of the Securities Act of 1933 ("Securities Act")[1], and/or the reporting, books and records, and internal controls provisions of the federal securities laws—Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder. Additionally, the Company's reported financial results were smoothed through misapplications of GAAP. These practices were not disclosed to investors.

4.     As a direct result of these violations, and other errors, Fannie Mae expects to restate its historical financial statements for the years ended December 31, 2003 and 2002, and for the quarters ended June 30, 2004 and March 31, 2004. The Company currently estimates that its restatement will result in at least an $11 billion reduction of previously reported net income.

---

[1] Establishing violations of Section 17(a)(2) and 17(a)(3) does not require a showing of scienter. Aaron v. SEC, 446 U.S. 680, 697 (1980).

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6.    Venue is proper in the Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.    In connection with the transactions, acts, practices and courses of business alleged herein, Fannie Mae, directly or indirectly, made use of the means or instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange.

8.    Fannie Mae is headquartered in the District of Columbia, and the transactions, acts, practices and courses of business alleged herein occurred within the District of Columbia.

## DEFENDANT

9.    Fannie Mae is a shareholder-owned government-sponsored enterprise chartered by Congress to expand the flow of mortgage funds by creating a secondary market. Fannie Mae provides stability in the secondary market for residential mortgages by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing. It performs this function by buying and guaranteeing residential mortgage loans and mortgage-related securities, which it finances by issuing mortgage-related securities, debt securities, and equity securities.

10.     At all relevant times, Fannie Mae's common stock traded publicly on the New York Stock Exchange. In March 2003, Fannie Mae voluntarily registered its common stock with the Commission under Section 12(g) of the Exchange Act, thus becoming an Exchange Act reporting company. Prior to its voluntary registration, the Company issued annual and quarterly reports of its financial condition and results of operations that were virtually identical in presentation to the reports filed with the Commission by registrants. In these reports, the Company represented that its financial statements were presented in accordance with GAAP.

## FACTS

**Overview Of The Violations**

11.     From at least 1998 through the second quarter of 2004, Fannie Mae issued financial reports that were materially false and misleading, primarily due to its failure to comply with Statement of Financial Accounting Standard ("SFAS") 133. These violations had the result of achieving management's desire: (a) to show predictable and steady earnings growth; and (b) avoid income statement volatility.

12.     In addition to violating SFAS 133, the Company violated other accounting standards, including SFAS 91. The violations of these standards resulted from insufficient accounting systems and related personnel, a lack of internal controls, and – in at least one instance – a desire to maximize bonuses and meet or exceed the published expectations of industry analysts forecasting the Company's reported earnings-per-share and other results.

13.     Fannie Mae's senior management fostered a corporate culture that placed significant emphasis on stable earnings growth and avoidance of income statement

4

volatility, and insufficient emphasis on ensuring compliance with applicable accounting regulations and federal securities laws.

14. As a consequence, Fannie Mae implemented a series of non-GAAP policies, procedures, and practices that falsely portrayed the Company's earnings. These non-GAAP policies, procedures, and practices included, but were not limited to: (1) improper accounting for loan fees, premiums, and discounts; and (2) improper hedge accounting.

15. Several of the transactions, acts, practices, or courses of business alleged herein were directed and/or implemented with the knowledge or approval of Fannie Mae's senior management acting within their scope of authority. In many instances, the Company's non-GAAP policies, procedures, and practices were reviewed by its independent auditor.

**Improper Accounting For Loan Fees, Premiums, And Discounts**

16. SFAS 91[2] requires companies to recognize loan fees, premiums, and discounts as an adjustment over the life of the applicable loans, to generate a "constant effective yield" on the loans. Because of the possibility of loan prepayments, the "life" of a loan or a group of loans is, necessarily, the product of estimation. The likelihood of prepayment fluctuates with market and other conditions. Consequently, estimated prepayments also change. SFAS 91 requires that changes to the amortization of fees, premiums, and discounts caused by changes in estimated prepayments be recognized as gain or loss in the current period's income statement, in their entirety. Any difference between the prior amortization balance and the current balance due to estimated

---

[2] ACCOUNTING FOR NONREFUNDABLE FEES AND COSTS ASSOCIATED WITH ORIGINATION OR ACQUIRING LOANS AND INITIAL DIRECT COSTS OF LEASES, Statement of Fin. Accounting Standards No. 91, (Fin. Accounting Standards Bd. 1982).

prepayment speeds must be recognized in income for the current period. Fannie Mae referred to this amount as the "catch-up" adjustment.

17.     SFAS 91 applies to various types of assets on Fannie Mae's books, including loans, mortgage backed securities, and real estate mortgage investment conduits. While the company adopted SFAS 91 in 1987, it did not record any catch-up adjustments prior to 1998.

### Fannie Mae Failed To Record The Full SFAS 91 Catch-up Amount For 1998

18.     In the fourth quarter of 1998, Fannie Mae's accounting models and systems calculated that an approximate $439 million catch-up adjustment, in the form of a decrease to net interest income, was required at year-end. Rather than book this amount consistent with SFAS 91, senior management of the Company directed employees to record only $240 million of the catch-up amount in that year's income statement. By not recording the full amount of the calculated catch-up adjustment, Fannie Mae understated its expenses and overstated its income by a pre-tax amount of $199 million. The unrecorded catch-up amount represents 4.3% of 1998 earnings before taxes ("EBT") and 4.9% of 1998 net interest income ("NII") for the Company's fiscal year 1998.[3]

19.     The Company's management made two additional adjustments in the fourth quarter of 1998 that had the effect of offseting nearly half of the $240 million catch-up adjustment.

20.     The first of these offsetting adjustments was caused by Fannie Mae's change from a non-GAAP to a GAAP treatment on its accounting for tax credits from, and depreciation expense related to, low-income housing tax credits. The change in

---

[3] Net interest income is the interest income earned on assets less interest expense paid on liabilities and capital. This is the gross margin for financial institutions.

6

treatment resulted in Fannie Mae recognizing two years' worth of credits at year end 1998, which had the net after-tax effect of recognizing $108 million in additional income. As late as November 1998, Fannie Mae planned to change its method of accounting for the tax credit in 1999. However, the change was accelerated to 1998, which substantially offset the recorded SFAS 91 catch-up adjustment.

21. The second adjustment was made after year-end and just prior to Fannie Mae closing its books for 1998. The Company recognized in income the reversal of aged credit items totaling $3.9 million, describing them as "miscellaneous income." These items came from a suspense account that had a credit balance of over $26 million before the $3.9 million reversal. For the most part, the credit balance in this account related to net interest income. This amount existed in a suspense account from at least as early as 1994, yet there was no reversal of the credit balances in this suspense account until the $3.9 million reversal for 1998.

22. Management's decisions to book an amount significantly less than the total calculated catch-up amount and to institute the two accounting adjustments in the fourth quarter of 1998 resulted in the Company not only exceeding Wall Street expectations, but also hitting the earnings per share ("EPS") target necessary to trigger maximum bonuses.

23. Under the Company's Annual Incentive Pool ("AIP") for 1998, an EPS figure of $3.13 would trigger minimum bonuses, an EPS figure of $3.18 would trigger the target bonus, and an EPS figure of $3.23 would trigger maximum bonuses.

24. Without these improper accounting adjustments, Fannie Mae's management could have received substantially smaller bonuses (based on either a pool of

7

only $17.3 million or only $8.6 million) or no bonuses at all. For example, prior to the 11th-hour reversal of suspense items, EPS for the year was $3.2285. While this figure exceeded Wall Street estimates of $3.22, it fell short of the $3.23 EPS figure required to trigger maximum bonus payouts. After the $3.9 million reversal of suspense items, EPS for the year was $3.2309, which triggered a maximum AIP bonus pool for management totaling $27.1 million. If Fannie Mae had recorded the full catch-up amount as initially calculated, its EPS would have been $3.10 for year-end 1998, a figure below the minimum threshold for bonuses under the AIP.

25.     By fraudulently failing to book the full amount of catch-up adjustment in the fourth quarter of 1998, Fannie Mae issued financial statements that were materially false and misleading. On January 14, 1999, Fannie Mae publicly issued its financial statements for the period ending December 31, 1998, which overstated pre-tax earnings by 4.3% and net interest income by 4.9%. Moreover, the Company failed to disclose that these figures had been intentionally manipulated to trigger management bonuses.

**Fannie Mae Failed To Record The Full SFAS 91 Catch-up Amount For 1999**

26.     At the direction of senior management, $158 million of the $199 million in unrecorded interest expense from 1998 was bled into the Company's financial statements during 1999. The Company recorded additional interest expense of between $7 million and $22 million a month throughout 1999. Additionally, the Company's calculated catch-up at year-end 1999 was $84 million of interest income, which was not recorded. As a result, Fannie Mae publicly issued materially false and misleading financial statements on January 13, 2000 for the year ended December 31, 1999.

8

### SFAS 91 Accounting Policy

27.     Prior to 2000, the Company had an unwritten policy of only booking SFAS 91 catch-up when it exceeded a "threshold" of +/- $100 million of net interest income ("NII") for the year. Following Fannie Mae's failure to record the full amount of calculated catch-up at year-end 1998, the Company developed a written SFAS 91 policy (the "Policy"). The concept of a threshold remained in the written Policy, and the threshold was calculated as a percentage of either NII or Guaranty Fees ("G-fees") under the rubric of accounting for estimation error. The Policy, which violated GAAP in several respects, allowed the Company to continue to decrease the likelihood of large SFAS 91 adjustments.

28.     The Policy used a "precision threshold" to determine the amount of catch-up Fannie Mae would record at the end of the year. This precision threshold was an amount equal to +/- 1% of NII or +/- 2% of G-fees for the period. Under this Policy, Fannie Mae was able to reduce the amount of catch-up recorded in any given period, as no adjustment would be recorded if the catch-up calculation fell within the threshold, and the Company would only record catch-up that exceeded the precision threshold.

29.     There is no support for the use of a threshold in SFAS 91 or in the Financial Accounting Standards Board ("FASB") implementation guide for SFAS 91 developed to assist companies in complying with the standard. SFAS 91 specifically requires that an adjustment be made when there is a difference between actual and expected prepayments, or a change in expected prepayments, of the loans resulting in a difference from the previous amortization calculation. Under SFAS 91, the amount of catch-up is to be determined based on the company's best estimate of the calculated

9

catch-up amount, not the best estimate as tempered by a threshold. The overlay of the precision threshold permitted Fannie Mae management to decrease the likelihood of large SFAS 91 adjustments by failing to record in the income statement catch-up adjustments that were within the threshold.

30.     Not only did Fannie Mae's use of a "threshold" violate GAAP, but so did its use of a full year time horizon rather than a quarterly basis as provided in SFAS 91. This practice of using a full-year time horizon for calculating the catch-up adjustment continued until 2003.

31.     Implementation of the Policy led to misstatements of SFAS 91 amortization in all periods from the fourth quarter 2000 through the second quarter 2004. Consistent with the models used by the Company during the relevant timeframe, some of the largest misstatements and omissions occurred in the following financial statements: third quarter 2001, fiscal year 2001, first quarter 2002, third quarter 2002, and fiscal year 2002.

32.     On at least one occasion, Fannie Mae booked income when it was within its Policy threshold, with the effect of meeting its earnings targets. The Company recorded its entire catch-up position of $19.8 million of income as part of its fourth quarter 2001 financial results, despite being within the calculated precision threshold established by the Company's Policy. Prior to recording this adjustment, which was done in January 2002 shortly before Fannie Mae closed its books for 2001, EPS for the fourth quarter was $1.3827 and analysts were expecting EPS of $1.39. After the catch-up adjustment, which was not justified by the Policy, Fannie Mae's quarterly EPS was $1.40.

10

33.     In the third quarter of 2002, Fannie Mae's calculated catch-up was $80 million over its Policy threshold. To comply with its stated Policy, management should have ensured that a catch-up adjustment of $80 million was recorded to income. Instead, management changed the methodology used to calculate the catch-up amount. This change in methodology improperly reduced the calculated catch-up adjustment by $37 million.

**Improper Hedge Accounting**

34.     In June 1998, the FASB released SFAS 133[4], requiring that, after January 1, 2001, derivatives be accounted for at fair market value. The standard essentially provides that derivatives must be revalued every reporting period, and changes to value must be reported in the income statement. To achieve hedge accounting in compliance with SFAS 133, a company associates each derivative contract with the specific liability, asset or forecasted transaction being hedged.

35.     Prior to the implementation of SFAS 133, derivatives were generally carried at book value on a holder's balance sheet. By requiring that they be carried at ever-changing market values, unless used in a qualifying hedge relationship, the new standard created the potential for increased earnings volatility. This posed a significant challenge to Fannie Mae's goal of avoiding volatility in its financial statements.

36.     An initial draft of SFAS 133 was released by the FASB in June 1996, at which point Fannie Mae began the process of evaluating and implementing the standard. As Fannie Mae uses debt to finance the acquisition of mortgages and mortgage securities, it uses derivative instruments to hedge against the effect of fluctuations in interest rates

---

[4] ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES, Statement of Fin. Accounting Standards No. 133 (Fin. Accounting Standards Bd. 1998).

11

on its debt costs. It quickly became apparent to the Company's management that SFAS 133 could cause an undesirable amount of earnings volatility. Minimizing, or to the extent possible eliminating, this earnings volatility became a focus of members of senior management.

37.     Because financial instruments react differently to interest rate movements, it is often difficult to perfectly hedge a debt issuance with an offsetting derivative. To the extent instruments do not perfectly offset each other, SFAS 133 generally requires companies to measure and record this "ineffectiveness" in their income statements.[5] This process is commonly referred to as the "long-haul" method. Thus, consistent with the standard, earnings volatility associated with the use of derivatives is minimized to the extent hedge relationships are "effective." Significantly, SFAS 133 allows for special exceptions, known colloquially as the "short-cut" and "matched terms" methods (or the "perfect effectiveness" method) of hedge accounting. These narrow exceptions allow qualifying companies to avoid the burdensome requirement of measuring and recording hedge ineffectiveness, and to avoid income statement volatility that can otherwise result from SFAS 133.

38.     Given the size of its portfolio, Fannie Mae did not have the systems or personnel necessary to perform long-haul accounting. Moreover, the long-haul method would result in the income statement volatility that senior management wanted to avoid.

39.     The Company disregarded the requirements of SFAS 133 and qualified transactions for the "short-cut" method based on erroneous interpretations and an unjustified reliance on materiality. By failing to comply with the requirements of SFAS

---

[5] Ineffectiveness is essentially the differential between the change in value of the derivative and the change in value of the hedged item.

12

133, the Company failed to qualify for hedge accounting. This failure led to the Company publicly issuing materially false and misleading financial statements for the periods covering the first quarter 2001 to the second quarter 2004. The vast majority of the anticipated restatement of at least an $11 billion reduction of previously reported net income is a result of Fannie Mae's improper hedge accounting.

### Other GAAP Violations—Reporting, Books And Records, & Internal Controls

### Accounting For Loan Loss Reserves

40.    GAAP requires an assessment of the loss exposure inherent in a loan portfolio and adjustments reflecting management's estimate of losses in the portfolio be made on a quarterly basis. Between 1997 and 2003, Fannie Mae performed no quantitative assessment, and instead relied on management's qualitative judgment in determining the appropriate loan loss reserve ("LLR"). The failure to establish and implement an appropriate model for determining the size of the LLR was a violation of GAAP.[6]

41.    The Company maintained an unjustifiably high level of LLR in case it was needed to compensate for possible future changes in the economic environment. This approach is not consistent with GAAP which requires that the estimate of loss reserves be based on losses currently inherent in the loan portfolio. At year-end 2002, Fannie Mae's LLR was overstated by at least $100 million. This overstatement resulted in a $100 million understatement of earnings before tax, which represented 1.6% of 2002 EBT, and 8 cents of additional EPS on the year-end 2002 EPS figure of $4.52.

---

[6] ACCOUNTING FOR CONTINGENCIES, Statement of Fin. Accounting Standards No. 5 (Fin. Accounting Standards Board 1975).

13

## System Realignment Adjustments

42.     Fannie Mae utilized several systems to calculate, record, and track premium and discount data on its loans and securities. At certain times, the premium and discount amortization system (known as "iPDI") would be manually adjusted to match the loan and securities databases (known as the "STATS" and "LASER" systems), resulting in a "realignment." These realignments produced a difference in accumulated amortization, which should have been adjusted for in the current period or may have required restatement of prior periods under GAAP. Rather than consistently follow the appropriate accounting guidance, Fannie Mae used three different methods to account for the realignment adjustments, two of which were improper under GAAP, and resulted in reported results that improperly spread the impact of these adjustments over time.

43.     APB 20[7] governs the treatment of accounting errors, and states that a company should determine the impact of the error on prior periods, as well as the impact of correcting those prior periods on the current period. Any material impacts must be reported as a prior period adjustment, and then disclosed in the current period's financial statements. Rather than apply this accounting guidance, Fannie Mae immediately recorded smaller realignments in the income statement but deferred large adjustments and recognized those as income statement items over future periods. The inconsistent accounting treatments utilized by the Company allowed it to avoid volatility in its financial statements from the required system realignment adjustments.

---

[7] ACCOUNTING CHANGES, Accounting Principles Bd. (APB) Opinion No. 20 (Accounting Principles Bd. 1971).

### Finite Insurance Transaction

44.    In May 2001, Fannie Mae's Office of the Chairman suggested that the
Company undertake an initiative to shift current income to future periods. One such
initiative involved employees in the Company's credit policy group entering into a finite
insurance contract in January 2002. The Company recognized the approximate $40
million premium under the contract as an expense, and recorded as income the loss
recoveries from the insurer in subsequent periods. GAAP requires that an insurance
contract result in a transfer of risk to the insurer in order for the premium paid to be
recorded as an expense, otherwise the premium is to be recorded as a deposit on the
balance sheet. This contract did not have sufficient risk transfer to qualify. Improperly
treating the approximate $40 million premium as an expense lowered the Company's
earnings by $13.5 million in each of 2002 and 2003, and approximately $8 million in
2004.

### Classification Of Securities Held In Portfolio

45.    SFAS 115[8] requires an entity to classify securities it acquires as either
held-to-maturity ("HTM"), available-for-sale ("AFS"), or trading at the time of
acquisition. Once a security is classified as HTM, it can be reclassified only in narrow
circumstances. Rather than adhere to the clear guidance under GAAP, Fannie Mae
initially classified the securities it acquired as HTM, and then at the end of the month of
acquisition, decided on the ultimate accounting classification. GAAP requires that the
accounting classification be made at the time of acquisition. This GAAP violation also
illustrates a significant internal control deficiency, as the Company could have

---

[8]  ACCOUNTING FOR CERTAIN INVESTMENTS IN DEBT AND EQUITY SECURITIES, Statement
of Fin. Accounting Standards No. 115 (Fin. Accounting Standards Bd. 1993).

improperly determined classification based on the change of a security's value between the date of acquisition and the end of the month.

## Recognition Of Interest Income And Expense

46.     Rather than recognize interest expense in accordance with the required terms of the instrument, Fannie Mae programmed its accounting systems to calculate interest expense and income on its investments and debt instruments as if there were 30.4 days in each month. Fannie Mae's systems used this assumption even if the terms of the instrument specified interest payments on a different basis. By using a standard figure, the Company avoided fluctuations in interest income and expense that would have occurred due to the fact that not every month has the same number of days, nor do the four quarters of the year. The Company discontinued this practice in early 2003.

## Amortization Of Debt Issuance Costs

47.     Fannie Mae amortizes debt issuance cost over the estimated life of the related debt. In the case of callable debt securities, the Company periodically adjusted the estimated life based on its current estimated call date. There appears to have been no consistent policy established regarding when the Company would make such a revision and evidence suggests that certain adjustments were made based on their impact on reported earnings. For example, the Company revised the estimated life of its callable debt in the third quarter of 2002, which had the effect of substantially offsetting a $43 million income item in that same period. GAAP requires that financial statements be prepared on a consistent basis and Fannie Mae's discretionary approach regarding the amortization of its debt issuance costs does not comply with this requirement.

16

## Accounting For Forward Commitments

48.     SFAS 149[9], which became effective on July 1, 2003, amended SFAS 133 by requiring entities to treat certain firm commitments to purchase or sell mortgage loans or mortgage backed securities ("MBS") as derivatives. Under SFAS 149, changes in the value of these commitments would be recorded in the financial statements unless they qualified for hedge accounting. Fannie Mae violated GAAP by failing to timely or adequately determine whether its mortgage commitments qualified for hedge accounting in accordance with SFAS 149. Because of inadequate resources in the departments most affected by SFAS 149, the Company did not adopt a final accounting policy until several months after SFAS 149 became effective. In addition, the hedge relationships were not properly documented at the inception of the hedge, therefore invalidating the use of hedge accounting. Even as late as the middle of 2004, the Company was still adjusting the specifications in its hedge accounting systems that dealt with SFAS 149 instruments.

## Consolidation Of Certain Securitization Transactions

49.     In connection with its adoption in 2003 of FASB Interpretation No. 46 (FIN 46R)[10], Fannie Mae failed to consolidate certain trusts used in connection with securitization transactions that were required to be consolidated on the balance sheet of the Company. The Company's failure resulted in an understatement in the assets and liabilities recorded on its balance sheet for any portion of the trusts owned by third parties. The consolidation will also result in the reclassification of security positions from securities to the actual assets held by the trust (principally loans or Fannie Mae MBS). In

---

[9] AMENDMENT OF STATEMENT 133 ON DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES, Statement of Fin. Accounting Standards No. 149 (Fin. Accounting Standards Bd. 2003).
[10] CONSOLIDATION OF VARIABLE INTEREST ENTITIES – AN INTERPRETATION OF ARB NO. 51, Fin. Accounting Standards Bd. Interpretation No. 46(R) (Fin. Accounting Standards Bd. 2003).

addition, the assets will be recorded at fair value on the date of consolidation, which may result in a gain or loss. Based on the Company's initial evaluation approximately $28.5 billion of both incremental assets and liabilities will be recognized in the financial statements.

### Accounting For Dollar Rolls

50.     Fannie Mae entered into short-term financing arrangements with counterparties that involved the Company "selling" a security out of its portfolio as collateral and agreeing to repurchase the same or "substantially the same" security at a later date. SFAS 140[11] permits these types of transactions to be accounted for as financings provided that certain conditions are met. If the requirements are not met, then security sale and purchase accounting is required. Fannie Mae failed to appropriately apply SFAS 140 in several respects. The Company's various departments failed to coordinate with each other to appropriately monitor the Dollar Roll transactions. This lack of oversight led the Company to fail to contemporaneously apply the tests necessary to determine whether the securities returned on the Dollar Roll transactions met the requirements to be considered "substantially the same" security. Additionally, SFAS 140 requires that entities monitor whether or not the cash received is adequate to repurchase the security sold. If the cash received is insufficient, the entity must request additional assets or cash from the counterparty. Fannie Mae had no procedures in place to meet this requirement.

---

[11] ACCOUNTING FOR TRANSFERS AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES – A REPLACEMENT OF FASB STATEMENT NO. 125, Statement of Fin. Accounting Standards No. 140 (Fin. Accounting Standards Bd. 2000).

## Valuation Of Aircraft Asset Backed Securities

51.     In the second quarter of 2003, having determined that its investments in aircraft asset backed securities ("ABS") had suffered an other than temporary impairment ("OTTI"), Fannie Mae reduced the value of its investment and recorded an expense of $83.5 million. The amount of the write-down was based on values obtained from an internal discounted cash flow model instead of available market prices. GAAP, and specifically SFAS 115, indicates that quoted market prices should be used to determine the amount of asset impairment. Market prices at the time indicated that the value of these securities was $45 million lower than the amount to which Fannie Mae wrote down its aircraft ABS. Under GAAP, the Company's adjustment should have been made according to this market price, and thus was understated by $45 million in expense. Failure to record the entire expense amount resulted in the Company overstating its income by $45 million in 2003. The $45 million in unrecorded expense represented 3.2% of quarterly earnings before tax in the second quarter of 2003, and 3 cents on 2003 EPS of $7.91.

## FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

52.     Paragraphs 1 through 26 are realleged and incorporated by reference as if set forth fully herein.

53.     As a consequence of the foregoing, Defendant Fannie Mae directly or indirectly, by use of the means and instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue

19

statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

54.     In connection with the above described acts or omissions, Defendant Fannie Mae acted knowingly or recklessly.

55.     By reason of the foregoing, Defendant Fannie Mae violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

## SECOND CLAIM

### Violations of Section 17(a)(2) and (3) of the Securities Act

56.     Paragraphs 1 through 10 and 27 through 39 are realleged and incorporated by reference as if set forth fully herein.

57.     As a consequence of the foregoing, Defendant Fannie Mae, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (a) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

58.     By reason of the foregoing, Defendant Fannie Mae violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

20

### THIRD CLAIM

#### Violation of Section 13(a) of the Exchange Act and
#### Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

59.     Paragraphs 1 through 51 are realleged and incorporated by reference as if set forth fully herein.

60.     Section 13(a) of the Exchange Act and the rules promulgated thereunder require every issuer of registered securities to file reports with the Commission that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

61.     As a consequence of the foregoing, Defendant Fannie Mae filed materially false and misleading financial statements with the Commission.

62.     By reason of the foregoing, Defendant Fannie Mae violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] promulgated thereunder.

### FOURTH CLAIM

#### Violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

63.     Paragraphs 1 through 51 are realleged and incorporated by reference as if set forth fully herein.

64.     As a consequence of the foregoing, Defendant Fannie Mae failed to make and keep books, records, and accounts which accurately and fairly reflected the transactions and disposition of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act , and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Fannie Mae's corporate transactions were

executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP in violation of Section 13(b)(2)(B) of the Exchange Act.

65. By reason of the foregoing, Fannie Mae violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a) Grant a permanent injunction restraining and enjoining Defendant Fannie Mae and its officers, agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with it who receive actual notice of the Final Judgment by personal service or otherwise, from, directly or indirectly, violating Sections 17(a)(2) and (3) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder;

(b) Order Defendant Fannie Mae to disgorge all ill-gotten gains, together with prejudgment interest;

(c) Order Defendant Fannie Mae to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(d) Order, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, that the amount of civil penalties ordered against and paid by the Defendant be added to and become part of a disgorgement fund for the benefit of the victims of the violations alleged herein; and

22

(e)    Grant such other and further relief as this Court deems necessary and

appropriate under the circumstances.

Dated: May 23, 2006

Respectfully submitted,

Jordan A. Thomas (Bar No. 452886)
Peter H. Bresnan
Paul R. Berger
Richard W. Grime
Charles E. Cain
Margaret S. McGuire
Rachael E. Schwartz
Bryan J. Sillaman

SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E., Mail Stop #4030
Washington, DC 20549
Tel.: (202) 551-4475 (Thomas)
Fax.: (202) 772-9245 (Thomas)
Attorneys for Plaintiff

23

# Report of the Special Examination of
# Fannie Mae



## May 2006

**Summary of the Report**

- Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as "best in class" in terms of risk management, financial reporting, internal control, and corporate governance. The findings in this report show that risks at Fannie Mae were greatly understated and that the image was false.

- During the period covered by this report—1998 to mid-2004—Fannie Mae reported extremely smooth profit growth and hit announced targets for earnings per share precisely each quarter. Those achievements were illusions deliberately and systematically created by the Enterprise's senior management with the aid of inappropriate accounting and improper earnings management.

- A large number of Fannie Mae's accounting policies and practices did not comply with Generally Accepted Accounting Principles (GAAP). The Enterprise also had serious problems of internal control, financial reporting, and corporate governance. Those errors resulted in Fannie Mae overstating reported income and capital by a currently estimated $10.6 billion.

- By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders. Earnings management made a significant contribution to the compensation of Fannie Mae Chairman and CEO Franklin Raines, which totaled over $90 million from 1998 through 2003. Of that total, over $52 million was directly tied to achieving earnings per share targets.

- Fannie Mae consistently took a significant amount of interest rate risk and, when interest rates fell in 2002, incurred billions of dollars in economic losses. The Enterprise also had large operational and reputational risk exposures.

- Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the Enterprise's operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices.

- The Board's failures continued in the wake of revelations of accounting problems and improper earnings management at Freddie Mac and other high profile firms, the initiation of OFHEO's special examination, and credible allegations of improper earnings management made by an employee of the Enterprise's Office of the Controller.

- Senior management did not make investments in accounting systems, computer systems, other infrastructure, and staffing needed to support a sound internal control system, proper accounting, and GAAP-consistent financial reporting. Those failures came at a time when Fannie Mae faced many operational challenges related to its rapid growth and changing accounting and legal requirements.

- Fannie Mae senior management sought to interfere with OFHEO's special examination by directing the Enterprise's lobbyists to use their ties to Congressional staff to 1) generate a Congressional request for the Inspector General of the Department of Housing and Urban Development (HUD) to investigate OFHEO's conduct of that examination and 2) insert into an appropriations bill language that would reduce the agency's appropriations until the Director of OFHEO was replaced.

- OFHEO has directed and will continue to direct Fannie Mae to take remedial actions to enhance the safe and sound operation of the Enterprise going forward. OFHEO staff recommends actions to enhance the goal of maintaining the safety and soundness of Fannie Mae.

JUDGE CARTER **11 CIV 9202**

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** : | |
| **Plaintiff,** : | **Civil Action No. 11-C** |
| -v.- : | **ECF Case** |
| **DANIEL H. MUDD, ENRICO DALLAVECCHIA, and THOMAS A. LUND,** : | **Jury Trial Demanded** |
| **Defendants.** : | |



---

### COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission") for its Complaint alleges as follows:

### SUMMARY OF ALLEGATIONS

1. This action arises out of a series of materially false and misleading public disclosures by the Federal National Mortgage Association ("Fannie Mae" or the "Company") and certain of its former senior executives concerning the Company's exposure to subprime mortgage and reduced documentation Alt-A loans. Eager to promote the impression that Fannie Mae had limited exposure to subprime and Alt-A loans during a period of heightened investor interest in the credit risks associated with these loans, Fannie Mae and its executives misled investors into believing that the Company had far less exposure to these riskier mortgages than in fact existed.

2. Between December 6, 2006, and August 8, 2008, (the "Relevant Period"), Daniel H. Mudd ("Mudd"), Enrico Dallavecchia ("Dallavecchia") and Thomas A. Lund ("Lund")

(collectively, "Defendants"), made or substantially assisted others in making materially false and misleading statements regarding Fannie Mae's exposure to subprime and Alt-A loans.

3.    For example, in a February 2007 public filing, Fannie Mae described subprime loans as loans "made to borrowers with weaker credit histories" and reported that 0.2%, or approximately $4.8 billion, of its Single Family credit book of business as of December 31, 2006, consisted of subprime mortgage loans or structured Fannie Mae Mortgage Backed Securities ("MBS") backed by subprime mortgage loans.

4.    Fannie Mae did not disclose to investors that in calculating the Company's reported exposure to subprime loans, Fannie Mae did not include loan products specifically targeted by the Company towards borrowers with weaker credit histories, including Expanded Approval ("EA") loans. As of December 31, 2006, the amount of EA loans owned or securitized in the Company's single-family credit business was approximately $43.3 billion, yet none of these loans were included in the Company's disclosed subprime exposure.

5.    Fannie Mae's exclusion of loans such as EA from its subprime disclosures was particularly misleading because EA loans were exactly the type of loans that investors would reasonably believe Fannie Mae included when calculating its exposure to subprime loans. In fact, the Company identified EA as its "most significant initiative to serve credit impaired borrowers" in response to regulatory requests for information on its subprime loans. In addition, all of the Defendants knew that EA loans had higher average serious delinquency rates, higher credit losses, and lower average credit scores than the loans Fannie Mae included when calculating its disclosed subprime loan exposure.

6.    In a November 2007 public filing, Fannie Mae described subprime loans as a loan to a borrower with a "weaker credit profile than that of a prime borrower," classified mortgage

loans as "subprime" if the mortgage loans were originated by a "specialty" subprime lender or a "subprime division of a large lender," and again represented that only 0.2%, or approximately $4.8 billion, of its Single Family credit book of business consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans as of both March 31, 2007, and June 30, 2007.

7.     Fannie Mae did not tell investors that in calculating the Company's exposure to subprime loans reported in this filing, Fannie Mae again did not include at least $43 billion of EA loans, included loans from only fifteen loan originators of the approximately 210 lenders listed on the HUD Subprime Lender list, and did not even have the capacity to track whether loans were originated by a subprime division of a large lender.

8.     Fannie Mae made similarly misleading disclosures concerning its exposure to subprime loans in public filings throughout the Relevant Period. The result of these disclosures was to mislead investors into seriously underestimating Fannie Mae's exposure to subprime loans.

9.     Similarly, Fannie Mae misled investors concerning its exposure to Alt-A loans with reduced or alternative documentation requirements. Fannie Mae did not disclose the total percentage of its Single Family mortgage guarantee business consisting of reduced documentation loans as reflected in its own internal reporting, which Defendants routinely received throughout the Relevant Period.

10.     Instead, in its public disclosures, Fannie Mae described Alt-A loans as loans with lower or alternative documentation requirements, and then further stated that it classified loans as "Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features."

3

11.    Based on this reporting construct, for example, in a May 2007 filing, Fannie Mae publicly reported that approximately 11% of its total Single Family mortgage credit book of business as of March 31, 2007, consisted of Alt-A mortgage loans or Fannie Mae mortgage securities backed by Alt-A mortgage loans. This filing materially underreported the extent of Fannie Mae's total exposure to low documentation loans, which was approximately 17.9% as of March 31, 2007, based on Fannie Mae's own internal records.

12.    Fannie Mae also did not disclose to investors that certain reduced documentation loans it received from lenders were not included in the calculation of Fannie Mae's publicly disclosed Alt-A loan exposure if the reduced documentation requirements were internally designated as Lender-Selected. Despite this exclusion, during the Relevant Period, Lender-Selected Reduced Documentation Loans had a serious delinquency rate that was substantially higher than Fannie Mae's full documentation loans with a similar credit risk profile. Further, Fannie Mae did not tell investors that the Company itself provided lenders—in advance—with the coding designations for Alt-A versus Lender-Selected.

13.    The result of these disclosures was to mislead investors into materially underestimating Fannie Mae's exposure to reduced documentation loans. Fannie Mae made similarly misleading disclosures concerning its exposure to reduced documentation loans in public filings throughout the Relevant Period.

14.    Mudd, Lund and Dallvecchia each knew, based on reports and internal data they received on a regular basis, that the Company's reported exposure to subprime and Alt-A loans was inaccurate. The misleading statements describing subprime and Alt-A loans occurred in periodic and other filings with the Commission, and public settings, including investor and analyst calls and media interviews. Mudd, Lund and Dallavecchia reviewed and approved each

of the false public filings. Mudd and Dallavecchia each made public statements falsely claiming that the Company's exposure to subprime loans was minimal.

15. By engaging in the misconduct described herein, Mudd violated and aided and abetted the violation of the antifraud and reporting provisions of the federal securities laws; Dallavecchia violated the antifraud provisions and aided and abetted the violation of the antifraud and reporting provisions of the federal securities laws; and Lund aided and abetted violations of the antifraud and reporting provisions of the federal securities laws. The Commission seeks injunctive relief, disgorgement of profits, prejudgment interest, civil penalties and other appropriate and necessary equitable relief from both defendants.

## JURISDICTION AND VENUE

16. The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) of 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa)], and 28 U.S.C. § 1331.

17. Venue is proper in the Court pursuant to Section 22(a) of the Securities Act, [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

18. Defendants Mudd, Dallavecchia and Lund directly or indirectly made use of the means or instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

## DEFENDANTS

19. **Daniel Mudd**, age 53, was Chief Executive Officer ("CEO") of Fannie Mae from June 2005 until September 2008, interim CEO from December 2004 until June 2005, and Chief Operating Officer ("COO") from February 2000 until November 2004. Ultimately, Mudd was removed as CEO of Fannie Mae after its regulator, the Federal Housing Finance Agency ("FHFA"), placed Fannie Mae into conservatorship in September 2008. Mudd is a resident of Greenwich, Connecticut. Mudd certified Fannie Mae's Forms 10-K and Forms 10-Q during the Relevant Period, including Fannie Mae's 2005 10-K filed May 2, 2007, its 2006 10-K filed August 16, 2007, its 2007 Form 10-Qs filed November 9, 2007, and its 2007 Form 10-K filed February 27, 2008. Mudd reviewed and approved Fannie Mae's Forms 12b-25 filed February 27, 2007, and May 9, 2007.

20. **Enrico Dallavecchia**, age 50, was Chief Risk Officer ("CRO") of Fannie Mae from June 2006 until August 2008 when he was removed by the Board along with two other executives. As CRO, Dallavecchia sub-certified all of Fannie Mae's Annual Forms 10-K and quarterly Forms 10-Q. He also reviewed and approved Fannie Mae's Forms 12b-25 dated February 27, 2007 and May 9, 2007. Dallavecchia is a resident of Potomac, Maryland.

21. **Thomas Lund**, age 53, was a Fannie Mae employee since 1995 who served as Executive Vice-President ("EVP") of Fannie Mae's Single Family Credit Guarantee ("Single Family") business from July 2005 until June 2009. As EVP of the Single Family business, Lund sub-certified all of Fannie Mae's Annual Forms 10-K and quarterly Forms 10-Q. He also reviewed and approved Fannie Mae's Forms 12b-25 dated February 27, 2007, and May 9, 2007. Lund is a resident of Cabin John, Maryland.

## RELEVANT ENTITY

22.     **Fannie Mae** was, at all times relevant to this Complaint, a shareholder-owned Government Sponsored Enterprise ("GSE") established by the U.S. Congress in 1938 to support liquidity, stability and affordability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold. Fannie Mae provides market liquidity by securitizing mortgage loans originated by lenders in the primary mortgage market into Fannie Mae MBS, and purchasing mortgage loans and mortgage-related securities in the secondary market for Fannie Mae's mortgage portfolio. By law, securities issued by Fannie Mae are "exempted securities." Accordingly, registration statements with respect to Fannie Mae's offerings are not filed with the Commission.

23.     In March 2003, Fannie Mae voluntarily registered its common stock with the SEC under Section 12(g) of the Exchange Act and has, since then, been required to file periodic and current reports with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.

24.     Throughout the Relevant Period, Fannie Mae's common stock traded publicly on the New York Stock Exchange ("NYSE"). Its principal place of business was and is in Washington, D.C.

25.     On July 30, 2008, when the President signed into law the Housing and Economic Recovery Act of 2008 ("HERA"), the Federal Housing Finance Agency ("FHFA") became Fannie Mae's primary regulator.

26.     On August 8, 2008, Fannie Mae announced a net loss of $2.3 billion. Fannie Mae stated that it was no longer certain that it would have enough capital to carry it through its losses. At this time, the Company announced that the main cause for its increased credit losses was the

deterioration in the credit performance of a small number of higher risk loan products, including Alt-A loans. As of the third quarter of 2008, more than 70% of Fannie Mae's credit losses were caused by its subprime and Alt-A loans.

27.     On September 6, 2008, FHFA placed Fannie Mae into conservatorship and, as conservator, FHFA succeeded to all the rights, titles, powers and privileges of Fannie Mae, its shareholders, and the officers or directors of Fannie Mae with respect to the Company and its assets.

## BACKGROUND
### *Fannie Mae Single Family Mortgage Guarantee Business*

28.     Fannie Mae's Single Family mortgage credit book of business was $2.34 trillion in 2006, $2.65 trillion in 2007, and $2.8 trillion in September 2008 when the Company was placed into Conservatorship.

29.     During the Relevant Period, Fannie Mae operated three business segments—(i) Single Family; (ii) Multi-Family; and, (iii) Capital Markets.

30.     Fannie Mae's primary business segment is the Single Family business, which works with lender customers to securitize Single Family mortgage loans (relating to properties with four or fewer residential units) into Fannie Mae MBS and to facilitate the purchase of Single Family mortgage loans for Fannie Mae's portfolio. Revenues in Fannie Mae's Single Family business are derived primarily from fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans underlying Fannie Mae's Single Family MBS. During the Relevant Period, the Single Family business comprised approximately 51%, 64% and 54% of Fannie Mae's net revenues in each of 2006, 2007, and 2008, respectively.

31.     Fannie Mae's Single Family business principally acquired loans through one of two channels: (i) the Lender (or flow) channel, which obtained loans from lenders on a going-

forward or contractual basis through agreements to purchase loans from lenders before those loans were originated based on certain terms and conditions; and, (ii) the Investor (or bulk) channel, which acquired from lenders loans that had already been originated based on data files for those loans that were provided by lenders to Fannie Mae for review prior to purchase.

32.     Fannie Mae's Single Family business had a proprietary automated underwriting system called Desktop Underwriter ("DU"). DU was used by the Single Family business to assess the primary risk factors of a loan in order to measure that loan's default risk. Customers of Fannie Mae also used DU to originate and underwrite loans so those customers would know—in advance—whether any given loan was eligible for sale to Fannie Mae. When DU provided a Fannie Mae customer with an "approve" for a loan application, that customer knew that Fannie Mae would agree to acquire that loan and waive certain warrants and representations so long as the loan is originated in accordance with information originally submitted via DU.

33.     At various times during the Relevant Period, Fannie Mae adjusted and recalibrated the risk assessment models within its DU system. For instance, in 2006, in connection with its *Say Yes* strategy to regain market share, Fannie Mae employed a "DU Bump" wherein eligibility parameters were expanded to provide more "approve" messages in DU for larger volumes of loans with lower FICO scores and higher LTVs than previously permitted. By adjusting and recalibrating the risk assessment models within its DU system, Fannie Mae took on increasingly risky loans during the Relevant Period.

34.     While many mortgage originators used Fannie Mae's DU system as part of the underwriting process, many large mortgage lenders also had their own automated origination and underwriting platforms. For instance, during the Relevant Period, Countrywide Financial

Corporation's (Countrywide) proprietary underwriting system was called *Clues*, and Freddie Mac had a system similar to DU that was called *Loan Prospector*.

35.     Not all loans acquired by Fannie Mae were underwritten using DU. During the Relevant Period, Fannie Mae acquired and securitized mortgage loans that were underwritten through other automated underwriting systems or simply by agreed-upon standards in a manual process. For instance, Fannie Mae acquired loans under Countrywide Financials *Fast and Easy* loan program that were underwritten using Countrywide's *Clues* system. Similarly, most of the My Community Mortgage ("MCM") loans Fannie Mae acquired during the Relevant Period were manually underwritten by loan officers and mortgage brokers at various companies nationwide and not evaluated using DU.

### *Mudd's Role at Fannie Mae and his Disclosure Responsibilities*

36.     As COO and then CEO from 2000 until September 2008, Mudd oversaw all three Fannie Mae business units, including the Single Family business. Additionally, during the Relevant Period Mudd was a member of the Board of Directors, the Audit Committee, a regular attendee at the Board's Risk Policy and Capital Committee meetings, held regular weekly meetings with his direct reports the business units, and attended quarterly business unit briefings. Mudd regularly read, reviewed and marked-up draft periodic filings and met with individuals who provided sub-certifications prior to certifying Forms 10-K and Forms 10-Q.

37.     As CEO, and based on his prior role as COO, Mudd possessed detailed operational knowledge concerning Fannie Mae's subprime and reduced documentation loan exposure. Further, during the Relevant Period, Mudd routinely received acquisition, delinquency and credit loss data concerning subprime and Alt-A loans. Mudd certified filings and made

10

public statements describing Fannie Mae's subprime and reduced documentation loan exposure knowing that those public statements were false and misleading.

38.     With regard to subprime-quality and reduced documentation loans, he received at least quarterly risk briefings on the Single Family business in which data showing Fannie Mae's total subprime and reduced documentation loan exposure was presented.  Additionally, Mudd met weekly with his direct reports, who, among other things, informed him about Single Family loan acquisitions, trends and status with respect to market share targets.

39.     Mudd was well aware of the Company's increased acquisition of reduced documentation loans—indeed, Mudd himself directed the company to pursue that market.  For instance, in an April 26, 2006, Credit Risk meeting following a presentation on reduced documentation loans and their risks by the Single Family credit officer (who noted low documentation loans were riskier), Mudd stated that "the market is moving to low documentation and we need to actively pursue the keys to this market."

40.     Mudd oversaw Fannie Mae's 2006 market share increase during which the Single Family business grew its market share from 20% of total mortgage loan originations to 25% by acquiring more subprime and reduced documentation loans.  In part as a result of Fannie Mae's successful market share growth and timely filing of the company's periodic reports, Mudd's taxable compensation grew from $6.16 million in 2006 to $10.64 million in 2007.

41.     Throughout the Relevant Period, in addition to wages earned, Mudd—like all Fannie Mae executives—received an Annual Incentive Plan ("AIP") bonus that was tied to two things:  (i) Company performance, measured by attaining corporate year-end goals; and, (ii) personal performance, measured by attaining individual year-end goals.  The AIP program was designed to "put part of the participants' total compensation package at risk, based on the

achievement of one-year goals for both the participant and the corporation" with individual performance driving the AIP payout each year, adjusted for corporate goal performance. The AIP bonus for a given year's performance was paid out in the following fiscal year such that an AIP bonus for performance in 2006 was received in 2007.

42.     In his 2006 year-end report to the Board, Mudd noted that the Single Family business increased its market share, in part by entering new markets "especially Alt-A and subprime," that in response to filing the Company's 2004 Form 10-K, "the market and ratings agency reactions generally were positive—there were no big surprises," and that the Company's stock price improved by more than 20%. Mudd's 2006 taxable compensation was more than $6 million with approximately $2.5 million from his AIP bonus. In 2007, Fannie Mae's corporate goals included growing revenue, which the Single Family business set about doing by increasing its book by 5.6% with a plan to acquire more Alt-A and subprime loans. In 2007, Mudd's taxable compensation was more than $10 million—with $3.5 million from his AIP bonus alone. Mudd served as CEO for only eight full months in 2008, but his taxable compensation in 2008 was $7.4 million—with more than $2. 2 million from his AIP bonus based on his personal performance for 2007.

43.     Mudd was also well aware that investors were increasingly focused on subprime loans. In a February 6, 2007 memo to the Board of Directors of Fannie Mae, Mudd wrote that investors and analysts were "focused on our market share, subprime risk and our portfolio strategy." As CEO of Fannie Mae, Mudd routinely interacted with investors and the media. During the Relevant Period, as investors and the media increasingly focused their attention on the credit risks associated with subprime and Alt-A mortgage loans, Mudd made numerous false and misleading statements that downplayed the Company's exposure to such loans and provided

false assurance to the market that Fannie Mae was participating in a safer segment of the mortgage market. Indeed, Mudd created the false perception that Fannie Mae's participation in high credit risk loans such as Alt-A and subprime was small and contained, and reinforced this false and misleading impression, telling investors that Fannie Mae was in the prime—not the subprime—market with a different, higher set of standards and underwriting.

44.    Mudd was knowledgeable about the mortgage markets. While CEO of Fannie Mae, Mudd made numerous appearances before Congress to testify about the mortgage markets, the role of the GSEs and the subprime market. In that setting, Mudd repeatedly minimized Fannie Mae's reported exposure, falsely claiming it was less than 2% of the Company's book or that Fannie Mae held about zero percent subprime.

45.    During the Relevant Period, Mudd received, reviewed and commented on (often in handwritten notes) multiple draft versions of each of Fannie Mae's periodic and other filings with the Commission. Prior to certification, Mudd met—seriatim—with officers of the Company who had provided sub-certifications to discuss issues presented by upcoming public filings. Also, as a member of the Audit Committee at Fannie Mae and the Board of Directors, Mudd participated in final committee and board reviews of Fannie Mae's Forms 10-K and Forms 10-Q during the Relevant Period prior to certifying.

### Lund's Role at Fannie Mae and his Disclosure Responsibilities

46.    Lund served as an officer at Fannie Mae for fourteen years, from 1995 until his retirement in 2009, and was EVP of the Single Family business at Fannie Mae from 2005 forward. Lund was a member of the Executive Committee and was the senior-most executive in charge of the Single Family business. He received and provided regular reports on the actual

volumes of Single Family subprime and reduced documentation loan acquisitions, the associated delinquency rates, and credit losses for all subprime-quality and reduced documentation loans.

47.    Lund received Single Family acquisition data on at least a monthly basis detailing acquisitions of reduced documentation and subprime-quality loans. As the senior executive in charge of the Single Family business, Lund was knowledgeable about Fannie Mae's loan acquisitions and the performance of Fannie Mae's high credit risk loan portfolio.

48.    At Mudd's weekly direct reports meetings, Lund provided Single Family business overviews to the CEO and others. Lund also held weekly meetings with his direct reports. The SVP for the Western Business Office of Fannie Mae routinely updated Lund on that region's then-most significant customers: Countrywide, IndyMac and WAMU.

49.    Lund was also a member of Fannie Mae's Disclosure Committee, which oversaw the preparation of the Company's periodic (and other) filings with the Commission. During the Relevant Period, Lund was the only Single Family business executive that sat on Fannie Mae's Disclosure Committee and was, therefore, uniquely positioned to inform that Committee about the Single Family loan portfolio. Fannie Mae attendance records from the Relevant Period reflect that Lund routinely attended Disclosure Committee meetings where contemplated draft filings with the Commission were reviewed and issues discussed.

50.    During the Relevant Period, Lund also received and reviewed draft versions of Fannie Mae's periodic and other filings with the Commission before they were publicly filed. While he knew the difference between the actual and the reported volumes of subprime and reduced documentation loans, Lund did not ensure that investors were likewise informed. Instead, he sub-certified as to the accuracy of the Company's materially false and misleading

14

disclosures concerning its exposure to subprime and Alt-A loans, which were directly within his area of knowledge and responsibility.

51.     During his tenure as EVP of the Single Family business, Lund oversaw Fannie Mae's 2006 market share growth, and, in part as a result of its success and timely filing of the company's periodic reports, Lund's taxable compensation grew from $833,658 in 2006 to $1.9 million in 2007.

52.     Throughout the Relevant Period, in addition to wages earned, Lund received an AIP bonus tied to attaining corporate and personal goals. In 2006, Fannie Mae's corporate goals included filing its 2004 Form 10-K, hitting Single Family MBS issuance targets, increasing profitability in the Single Family business, and reintroducing the Company to investors. In 2006, owing to its *Say Yes* business strategy, the Single Family business exceeded its goal of increasing market share from 20% to 25.4%, and on a corporate level, the Company grew its stock price more than 20%—from just under $49 to over $60 per share. Lund's 2006 taxable compensation was $833,658 with $792,960 from his AIP bonus. By contrast, in 2005, Lund's wages totaled $497,285. This represented a 67% increase in compensation between 2005 and 2006.

### *Dallavecchia's Role at Fannie Mae and his Disclosure Responsibilities*

53.     Enrico Dallavecchia served as Fannie Mae's EVP and Chief Risk Officer from June 2006 through August 2008. In that position, Dallavecchia reported directly to Mudd and was responsible for credit, market, counterparty, and operational risk oversight for all business units within Fannie Mae, which included measuring, reporting, and monitoring Fannie Mae's risk profile and formulating the Company's risk policies. As the senior-most executive in charge of credit risk, Dallavecchia received and provided regular reports on the actual volumes of

subprime and reduced documentation loan acquisitions, the associated delinquency rates, and credit losses for those loans at Fannie Mae.

54.     Dallavecchia was also a member of Fannie Mae's Disclosure Committee, which oversaw the preparation of the Company's periodic (and other) filings with the Commission. During the Relevant Period, Dallavecchia was the only executive from the Chief Risk Office who sat on Fannie Mae's Disclosure Committee. As CRO, Dallavecchia was uniquely positioned to recognize and inform others about the overall credit risks presented by Fannie Mae's loan portfolio.

55.     Fannie Mae attendance records from the Relevant Period reflect that Dallavecchia routinely attended Disclosure Committee meetings where contemplated draft filings with the Commission were reviewed and issues discussed. Dallavecchia personally received and reviewed draft versions of Fannie Mae's periodic and other filings with the Commission. Dallavecchia sub-certified as to the accuracy of the Company's materially false and misleading disclosures concerning its exposure to subprime and Alt-A loans, thereby substantially assisting the Company's fraud.

56.     Dallavecchia and the Single Family CRO team assisted in drafting the definition of subprime contained in the February 27, 2007, Form 12b-25 in which Fannie Mae first quantified its subprime exposure.

57.     Dallavecchia occasionally led the Board's Risk, Policy and Capital Committee meetings and attended Executive Committee meetings. In those roles, Dallavecchia received information and data concerning Fannie Mae's total exposure to reduced documentation and subprime loans.

58. As Fannie Mae's CRO, Dallavecchia had credit risk oversight for Fannie Mae's 2006 market share growth, and, in part as a result of its success and timely filing of the company's periodic reports, Dallavecchia's taxable compensation more than doubled from $617,886 for 7 months of service in 2006 to $2.68 million in 2007.

59. Throughout the Relevant Period, in addition to wages earned, Dallavecchia received an AIP bonus tied to attaining corporate and personal goals. When Dallavecchia began as Fannie Mae's CRO, the then-Chairman of the Board of Directors noted in an address to Senior Management, "We have to think differently and creatively about risk ... Enrico Dallavecchia was not brought on-board to be a business dampener." In 2006, Fannie Mae's corporate goals included filing its 2004 Form 10-K, increasing its earnings per share, profitability, and subprime penetration while building a CRO function and implementing business unit risk officers. In his year-end 2006 self-assessment, Dallavecchia noted that the most significant achievement was his office playing a role "from both a risk perspective and also from a business perspective." Dallavecchia further noted that his office "authored the Risk Section of the 2004 10-K."

60. In 2007, Fannie Mae's corporate goals included growing revenue and timely periodic filings with the Commission. In addition to Fannie Mae meeting most of its 2007 corporate goals with respect to growing revenue, Mudd's year-end 2007 review of Dallavecchia noted that he completed the build out of the CRO structure, developed risk limits and did good work on the Board Risk Policy and Capital Committee. Dallavecchia's 2007 taxable compensation was more than $2.6 million with $1.04 million from his AIP bonus.

61. One month prior to conservatorship, in August 2008, Dallavecchia was terminated as CRO. Accordingly, Dallavecchia served as CRO for only seven full months in 2008; his 2008 taxable compensation was $2.3 million with $923,780 from his AIP bonus.

## OVERVIEW OF FANNIE MAE LOAN PROGRAMS

### *Fannie Mae's Reduced Documentation Loan Programs*

62.     During the 1990s, Fannie Mae had limited market presence in Alt-A mortgage loans, which were not a large part of mortgage originations nationwide.

63.     In July 1999, Fannie Mae and Countrywide Home Loans entered into an alliance agreement, which included a reduced documentation loan program called the "internet loan," which was soon thereafter re-branded by Countrywide as the *Fast and Easy* loan. This loan program featured a streamlined documentation process, which allowed mortgage-loan applicants with a qualifying FICO credit score to be preapproved for a mortgage loan without providing documentation to verify income or assets.

64.     The *Fast and Easy* loan program was popular. Fannie Mae executives referred to it as Countrywide's "signature" or "flagship" mortgage product. By the mid-2000s, other mortgage lenders developed similar reduced documentation loan programs such as Mortgage Express and PaperSaver—many of which Fannie Mae acquired in ever-increasing volumes throughout the Relevant Period.

65.     Alt-A loans proliferated in the marketplace, and during the Relevant Period Fannie Mae's Single Family business pushed to increase its acquisitions of those Alt-A loans. By year-end 2006, 35% of Fannie Mae's Single Family loan acquisitions were Alt-A loans. By year-end 2007, that number increased to 37%, and by June 30, 2008, 26% of its Single Family loan acquisitions were Alt-A loans.

### *Fannie Mae's Subprime Loan Programs*

66.     Since the late 1990s, Fannie Mae acquired and guaranteed subprime mortgage loans described in Fannie Mae periodic filings during the Relevant Period as loans made to

"borrowers with weaker credit histories" or "weaker credit profile[s]" that "have a higher likelihood of default than prime loans" as part of the Company's two primary programs for borrowers with weaker credit histories: Expanded Approval/Timely Payment Rewards ("EA") and MyCommunityMortgage ("MCM").

67. The credit risks posed by these programs were well understood by senior management at Fannie Mae. Mudd was familiar with the EA and MCM loan programs and the credit risks those loan programs entailed. Throughout the Relevant Period all the Defendants received reports, briefings and presentations containing acquisition volume, Serious Delinquency Rates ("SDQ Rates") and credit loss data with respect to Fannie Mae's EA and MCM loans. Throughout the Relevant Period, Mudd, Lund and Dallavecchia knew that EA loans were—on average—the highest credit risk loans on Fannie Mae's book of business, and knew that EA loans contributed disproportionately to Fannie Mae's credit losses.

68. Indeed, in May 2001, Mudd wrote a memo to the then-CEO noting that EA loans "are the highest default risk loans we have ever done."

69. Traditionally, Fannie Mae treated EA loans as part of its subprime exposure. For example, a March 2002 Report prepared for the U.S. Department of Housing and Urban Development ("HUD") with the participation of Fannie Mae, entitled "Subprime Markets, the Role of GSEs and Risk-Based Pricing," stated under a section entitled 'Agency Subprime Lending Products' that:

> The agencies are increasing their presence in the subprime market by rolling-out new subprime mortgage products through updated versions of their automated underwriting systems. Fannie Mae seller/servicers now offer loan products to three groups of credit-impaired borrowers under two new programs. Fannie Mae's Expanded Approval program allows lenders to approve borrowers who would have been formerly classified as 'Refer with Caution' ... by Fannie Mae's Desktop Underwriter (DU). ... The Expanded Approval products are recent innovations, and, according to Fannie Mae representatives, account for a

19

relatively small portion of that GSE's book of business ... At most, according to a Fannie Mae stock analyst, these subprime loan purchases will account for no more than five percent of that GSE's purchase volumes. (Emphasis added).

70.     Similarly, in its annual exam process in 2004 and 2005, Fannie Mae's then-primary regulator, the Office of Federal Housing Enterprise Oversight's ("OFHEO") asked for information on Fannie Mae's total Single Family subprime loan exposure, specifically requesting: "[t]he volume of loans purchased in 2004 [and 2005] defined as CE structured subprime ... or sub-prime as otherwise defined." In March of 2005 and April of 2006, respectively, Fannie Mae responded by providing OFHEO with information on mortgage loan purchases and mortgage-backed securities under the EA program, describing the EA program as, "our most significant initiative to serve credit-impaired borrowers."

71.     Moreover, before December 2006, various internal Fannie Mae reports, including reports to the Board, identified subprime loans as including: (i) investor channel subprime loans acquired as part of its Subprime NBI; (ii) A- Deal loans that pre-date December 2005; and, (iii) EA loans.

### *Fannie Mae Excluded EA and MCM Loans from its Subprime Disclosure*

72.     When Fannie Mae first reported its quantitative exposure to subprime loans in a filing with the Commission on February 27, 2007, the Company broadly defined subprime as loans to "borrowers with weaker credit histories." EA and MCM loans fell squarely within this definition, but were not included in the accompanying quantification of Fannie Mae's subprime exposure.

73.     Instead, the quantification consisted primarily of private label securities it held that were marketed as being backed by subprime loans, certain "A-" loans that the company acquired prior to 2005, and certain loans that had been acquired through a limited new business

20

initiative beginning in 2006. Fannie Mae's subprime quantification did not include significant numbers of other loans that fell within its published subprime definition of loans to "borrowers with weaker credit histories."

74. Throughout the Relevant Period, EA loans had, on average, higher SDQ rates than the loans Fannie Mae used in calculating its disclosed subprime exposure. Senior management at Fannie Mae, including the Defendants, were aware of this fact, as SDQ rates were tracked and regularly included in reports and other internal presentations. For example, in a meeting of the Risk Policy and Capital Committee ("RPCC") of Fannie Mae's Board, the CRO reported that as of July 2007 Fannie Mae's SDQ rates for EA were 5.57% (the highest on its book); by contrast, the SDQ rate of its disclosed subprime loans were 4.95 %.

75. Throughout the Relevant Period, the credit risk associated with Fannie Mae's EA and MCM acquisitions was reported to and tracked by senior management, including Defendants, in terms of acquisition volume, delinquencies, and credit losses—alongside those loans that were included when quantifying its disclosed "subprime" exposure in its public filings. EA and MCM loans were routinely included in reports tracking Fannie Mae's high risk loan products (which ranged from three to five or more loan types during the Relevant Period) that were received by the Defendants.

76. Also during the Relevant Period, senior executives, including the Defendants, were provided with credit loss data that showed that the greatest amount of credit losses attributable to any one loan type or product on Fannie Mae's Single Family book were attributable to the EA product. For instance, in an October 26, 2007, Disclosure Committee report, it is noted that EA loans were responsible for $188.9 million in losses and MCM loans

were responsible for $16 million in losses—compared to $5.5 million in losses for the loan population Fannie Mae disclosed as its subprime exposure.

77.     As a portion of Fannie Mae's book of business, EA loans increased in volume between 2006 and 2008 from $43.3 billion to $58.3 billion, totaling approximately 2% of the company's book of business during the Relevant Period.  MCM loans, which were intended for low-to-moderate income borrowers, accounted for between 0.3% and 1.5% of Fannie Mae's book of business over the same period.  None of these loans were included in Fannie Mae's calculation of its publicly disclosed subprime exposure.

### FANNIE MAE'S DISCLOSURES
*Overview*

78.     Since 2003 in its annual Form 10-K filings, Fannie Mae included a table of credit risk characteristics for Single Family loans ("Credit Risk Tables").  Those Credit Risk Tables contain information describing risk characteristics such as original LTV, Product Type, Property Type, Occupancy Type, FICO Credit Score bands, Loan Purpose, Geographic Concentration, and Origination Year. The tables did not include any statement or representation as to whether Fannie Mae held subprime and Alt-A loans.

79.     During the Relevant Period, Fannie Mae also provided narrative disclosures in its periodic filings concerning the company's expectation of credit losses, delinquencies, market environment and economic factors that could impact the company's business.  These narrative disclosures repeatedly contained materially false and misleading statements and representations regarding Fannie Mae's Alt-A and subprime exposure.

80.     During part of the Relevant Period, Fannie Mae also filed supplemental Form 8-Ks filed simultaneously with various Forms 10-K and Forms 10-Q that contained credit characteristic information concerning its Single Family book of business, along with a purported

22

tabular description of Fannie Mae's subprime and Alt-A holdings. None of the information contained in those supplement Form 8-Ks provided investors with an accurate description of the Company's subprime or Alt-A holdings. Although Fannie Mae claimed to provide additional information to investors, labeling a portion of loans "subprime" and "Alt-A" in a disclosure table, those tables included only a fraction of the loans that met Fannie Mae's own public definition of "subprime" or "Alt-A" in the quantification under each category. These supplemental disclosures deliberately gave investors false comfort that the Company's exposure to subprime and Alt-A loans was dramatically smaller than it, in fact, was.

*Fannie Mae's Initial Quantification of Subprime Exposure Was False and Misleading*

81.     By February 2007, following S&P's downgrade of high-profile subprime lender, New Century Financial Corporation, and other indicia of subprime market turmoil—including HSBC Holdings PLC's announcement that the U.S. subprime market was unstable—investors were increasingly focused on subprime loans and the risks associated with these loans.

82.     In a February 6, 2007 memo to the Board of Directors of Fannie Mae, Mudd wrote that investors and analysts were "focused on our market share, subprime risk and our portfolio strategy." With this backdrop, Fannie Mae's Disclosure Committee, which included Lund and Dallavecchia as members, decided to include a quantitative disclosure of Fannie Mae's exposure to subprime loans in the Company's public filings.

83.     According to an internal e-mail sent to both Lund and Dallavecchia, "Enrico [Dallavechia]'s team has been tasked with developing a definition of 'sub-prime,' as well as providing the numbers for the 12b-25."

84.     On February 23, 2007 in a call with investors Mudd stated: "Subprime mortgages are those offered to borrowers with damaged credit" and Fannie Mae's "subprime investment constitutes well below 2 percent of our book."

85.     Four days later on February 27, 2007, in a Form 12b-25 filing with the Commission, the Company disclosed the following regarding Fannie Mae's subprime exposure:

> Although there is no uniform definition for sub-prime … loans across the mortgage industry… sub-prime loans typically are made to borrowers with weaker credit histories … We estimate that approximately 0.2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of sub-prime mortgage loans or structured Fannie Mae MBS backed by sub-prime mortgage loans … We estimate that approximately 2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of private-label mortgage-related securities backed by sub-prime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by sub-prime mortgage loans. (Emphasis added.)

86.     The percentage of subprime loans disclosed by Fannie Mae did not include a material number of subprime-quality loans in the Fannie Mae Single Family mortgage credit book of business as of December 31, 2006, made to "borrowers with weaker credit histories." In particular, the percentage of subprime loans disclosed by Fannie Mae did not include the EA and MCM loans, which were the very types of loans that investors (and analysts) believed were the company's primary subprime exposure.

87.     Fannie Mae's exposure to EA loans in its Single Family mortgage credit book of business was approximately $43.3 billion as of December 31, 2006—approximately 10 times greater than the 0.2% ($4.8 billion) disclosed as "sub-prime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

88.     The February 27, 2007, disclosure falsely stated that Fannie Mae's total exposure to loans made to borrowers with weaker credit histories (subprime) was 2.2% of its total

mortgage credit book of business, when in fact its exposure was at least 4.64% (as of December 31, 2006).

89.     Nothing in Fannie Mae's public disclosures alerted investors that it held a much larger volume of loans that matched the Company's description of subprime loans but were not included in the reported subprime number.

90.     Although Fannie Mae excluded EA from its subprime reporting, Fannie Mae's EA loans had, on average throughout the Relevant Period, SDQ rates higher than those loans Fannie Mae actually included in calculating its disclosed exposure to subprime loans. As of January 2007, EA loans had an SDQ rate of 5.69%; disclosed Subprime loans (as-quantified in Fannie Mae's filings) had an SDQ rate of 4.82%.

91.     EA and MCM loans accounted for a higher percentage of Single Family credit losses (20.4%) at year-end 2006 than loans Fannie reported as its subprime exposure, which at the time were responsible for no credit losses.

92.     Mudd, Lund and Dallavecchia each reviewed and approved the February 27, 2007, Form 12b-25 statement before it was released by the Company, knowing its quantified subprime disclosure excluded EA and MCM loans.

### Dallavecchia's False and Misleading Statement

93.     That same day, February 27, 2007, Dallavecchia spoke directly to investors on a conference call and explained:

> In our filing today, we also indicate that we have increased our participation in subprime product in 2006. Our purchases have been prudent and have been made when we concluded that they would contribute to our mission objectives or they would general a profitable return. Given our view of the subprime market generally, let me offers [sic] some insight into our approach to this segment and the exposure to the risk. The first point, as per our filing, is that our exposure is modest. Approximately 0.2% of our single-family credit book of business consisted of subprime loans or Fannie Mae MBS backed by subprime loans … to

conclude my thoughts on credit risk, I anticipate our credit losses will trend upward as a result of the general softening of the housing market ... At the same time, I would advise that you consider our exposure in light of the strength of the risk characteristics I have described <u>and the immaterial size of our participation in the subprime market.</u> (Emphasis added.)

94.     Despite knowledge that the Company had exposure to approximately $43.3 billion worth of EA loans and $13.8 billion in MCM loans as of December 31, 2006, which fell squarely within Fannie Mae's publicly stated definition of subprime, Dallavecchia falsely represented that only "0.2% of [Fannie Mae's] Single Family credit book of business consisted of subprime loans,"

95.     Moreover, Dallavecchia further misled investors regarding Fannie Mae's subprime exposure by emphasizing that Fannie Mae's subprime was "modest," "prudent" and "immaterial." He gave the public these assurances knowing Fannie Mae's exposure to EA loans was at least ten times greater than "0.2% of [Fannie Mae's] single-family credit book of business." His purpose was clear. As Dallavecchia explained in an internal email on February 23, 2007, in preparing for the investor call, "I am trying to say that if you look at our guarantee book of business we have an insignificant exposure in subprime loans."

### *Mudd's False and Misleading Testimony Before Congress*

96.     On March 15, 2007, Mudd appeared before the House Financial Services Committee and gave testimony in a hearing on Legislative Proposals on GSE Reform. Mudd was asked: "And you have not engaged in the subprime market. You hadn't gone there to a great extent is that right?" In response, Mudd testified:

> The answer for Fannie Mae on behalf of subprime is that it's important to remember there is subprime and there is predatory. Subprime simply means . . . that you have a credit blemish, and we think those people are part of the market. It's less than 2 percent of our book. It's 80 percent insured. It's highly subordinated. We've been in it very carefully, consistent with some very strong anti-predatory lending guidelines we have.

26

97. At the time that Mudd gave this testimony, he knew that Fannie Mae EA loans were designed to provide loans to borrowers with weaker credit histories, i.e., "credit blemish[ed]" borrowers, and that the quantification of Fannie Mae's subprime holding as "less than 2 percent of our book" did not include EA or MCM loans. The following month, on April 17, 2007, Mudd again appeared before the Committee on Financial Services to provide testimony in a hearing on solutions to the subprime market turmoil. Mudd again testified: "'Subprime' is, after all, simply the description of a borrower who doesn't have perfect credit." He provided a broad description of Fannie Mae's efforts to reach "borrower[s] who do[n't] have perfect credit":

> We see it as part of our mission and our charter to make safe mortgages available to people who don't have perfect credit. In the past several years, for example, we have designed mortgage options to give borrowers with blemished credit access to high-quality, low-cost, non-predatory loans. We also set conservative underwriting standards for loans we finance to ensure the homebuyers can afford their loans over the long term . . . we continued our careful entry into the subprime market, by and large supporting lenders, products and practices that met our standards, and which helped us meet our HUD affordable housing requirements.

98. Having broadly defined "subprime" and described Fannie Mae's outreach to the market for borrowers without perfect credit, Mudd testified as to the amount of subprime held by Fannie Mae: "Today, our exposure remains relatively minimal – less than 2.5 percent of our book of business can be defined as subprime."

99. Mudd knew EA loans were loans specifically designed for "people who don't have perfect credit" —his own definition for subprime—and that the 2.5 percent figure he used did not include billions of dollars of EA and MCM loans. As such, his statement was knowingly false and misleading when made.

*Fannie Mae's False and Misleading Subprime Disclosures in its 2005 10-K Filing*

100.   In May 2007, Fannie Mae filed its 2005 Form 10-K, in which it supplemented its prior public definition of subprime. In addition to asserting that "subprime" generally refers to loans made to borrowers "with a weaker credit profile" and "borrowers [who] have a higher likelihood of default," Fannie Mae now disclosed that it classified loans as subprime if the loans were originated from a specialty subprime lender.

101.   On May 2, 2007, Fannie Mae filed its 2005 Form 10-K and stated:

"*Subprime mortgage*" generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold …We also estimate that subprime loans represented approximately 2.2% of our single-family mortgage credit book of business as of December 31, 2006, of which approximately 0.2% consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans and approximately 2% consisted of private-label mortgage-related securities backed by subprime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by subprime mortgage loans.

102.   Fannie Mae's reporting of its subprime exposure omitted approximately $43.3 billion worth of EA loans and $13.8 billion in MCM loans in Fannie Mae's Single Family mortgage credit book of business as of December 31, 2006—approximately 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

103.   Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

104.    In addition, while Fannie Mae stated that it classified loans as subprime if those loans were originated by specialty subprime lenders, that statement was materially false and misleading as well. Since 1993, the U.S. Department of Housing and Urban Development ("HUD") posted a publicly available HUD Subprime Lender list based on loan data and interviews with lenders themselves. Companies in the mortgage industry rely on the HUD Subprime Lender list as a proxy for identifying subprime lenders. Internal Fannie Mae documents reflect that its personnel, including Lund, were aware of the HUD Subprime Lender list as an accepted source for subprime-lender identification. During the Relevant Period, the HUD Subprime Lender list included approximately 210 lenders.

105.    The Company failed to disclose, however, that, when calculating Fannie Mae's subprime exposure, only certain loans that had been originated by 15 lenders were included. Fannie Mae purchased and guaranteed loans from many other lenders on the HUD list, but they were not included when calculating the Company's subprime exposure. Fannie Mae disclosed neither that it was restricting its definition of "specialty lender" to 15 lenders on the HUD list, nor the names of those lenders on the HUD list that it included in its calculations. In fact, Fannie Mae acquired loans from many other specialty lenders on the HUD Subprime Lender list, and EA loans were originated by lenders on the HUD list.

106.    Although EA was left out of Fannie Mae's subprime reporting, it was well-known within Fannie Mae that EA was generally considered subprime in the marketplace. For example, on April 5, 2007, the SVP of business and strategic development sent an email to a group of Fannie Mae executives including Lund and Dallavecchia, stating "mcm and ea are much deeper risks that we take and many (if not all) in the market call EA subprime. They are growing very

29

fast." Within a month, Fannie Mae filed its next public statement concerning its subprime exposure, and again omitted its exposure to EA and MCM loans.

107.    On May 9, 2007, Fannie Mae filed a Form 12b-25 with the Commission, which repeated the disclosure contained in the May 2, 2007 filing.

108.    As it had previously, Fannie Mae's reporting of its subprime disclosure in this May 9, 2007 filing omitted approximately $43.3 billion worth of EA loans and $13.8 billion in MCM loans in Fannie Mae's Single Family mortgage credit book of business as of December 31, 2006. That undisclosed subprime exposure was approximately 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

109.    Mudd, Lund and Dallavecchia had each reviewed and approved the Form 12b-25 dated May 9 2007 that was released by the Company.

### Fannie Mae's False and Misleading Subprime Disclosures for Year-End 2006

110.    In early August 2007, as Fannie Mae prepared a draft Form 8-K Credit Supplement to be filed simultaneous with its upcoming 2006 Form 10-K, Mudd personally requested additional basic data concerning the Company's credit book in a draft version of the Form 8-K. The additional data Mudd received from the CRO office on August 5, 2007, included details on the total volume of EA, MCM, disclosed subprime, and Alt-A loans Fannie Mae had on its book of business. This draft included SDQ data that clearly showed EA loans had a higher rate of delinquency (5.38%) than the Company's disclosed subprime loans (4.8%).

111.    The data provided to Mudd also included data on FICO scores that demonstrated that the credit quality of EA loans was worse than the credit quality of the loans that Fannie Mae disclosed as its subprime exposure. Specifically, the document disclosed that 53% of EA loans

had FICO scores below 620; whereas 47% of Fannie Mae's disclosed subprime had FICO scores below 620. Further, 26% of EA had FICO scores below 580 while 23% of disclosed subprime loans had FICO scores that low.

112. On August 3, 2007, as members of the Disclosure Committee, Dallavecchia and Lund both received the same draft credit supplement sent to Mudd. This information concerning EA and MCM was not ultimately made public.

113. Fannie Mae issued its 2006 Form 10-K less than two weeks after each of the defendants received the draft 8-K disclosure comparing EA and disclosed subprime, and documenting that EA loans had a higher serious delinquency rate than disclosed subprime and that EA loans had a weaker credit profile than disclosed subprime.. The public filing again defined "subprime" as "loans to borrowers with riskier credit profiles." Nevertheless, EA and MCM loans were not included when quantifying Fannie Mae's subprime exposure; nor was it disclosed that there were "loans to borrowers with riskier credit profiles" that were excluded from Fannie Mae's subprime reporting.

114. On August 16, 2007 Fannie Mae filed its 2006 Form 10-K and stated:

In recent years, we have increased our acquisitions of loans to borrowers with riskier credit profiles, referred to as subprime loans by the industry. Subprime mortgage loans that we acquire are generally originated by lenders specializing in this type of business, using processes unique to subprime loans. Based on data published by National Mortgage News and our internal economic analysis of the mortgage market, subprime mortgage loan originations have increased sharply in recent years, rising to a record high of approximately 24% of single-family mortgage loan originations in the first quarter of 2006 ... Our acquisitions of subprime mortgage loans have been significantly less than the overall market's share. We estimate that approximately 0.2% of our total single-family mortgage credit book of business as of December 31, 2006 consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans. We have also invested in highly rated private-label mortgage-related securities that are backed by ... subprime mortgage loans ... We estimate that ... private-label mortgage-related securities backed by subprime mortgage loans, including

31

resecuritizations, accounted for approximately ... 2% ... of our single-family mortgage credit book of business as of June 30, 2007.

115.    Fannie Mae's Single Family mortgage credit book of business consisted of approximately $43.3 billion worth of EA loans and $13.8 billion worth of MCM loans as of December 31, 2006 — more than 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of December 31, 2006.

116.    Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

117.    Mudd certified and Lund and Dallavecchia each sub-certified the 2006 Form 10-K even though they knew that the statements regarding the Company's subprime exposure were materially misleading.

### *Fannie Mae's False and Misleading Subprime Disclosures for First, Second and Third Quarters of 2007*

118.    In preparing to review the upcoming Fannie Mae filing, a Disclosure Committee Analytical Report was sent on October 26, 2007, to several individuals, including Mudd, Dallavecchia and Lund. The report presented data on Single Family's "[h]igher risk products," including EA, MCM, and disclosed subprime. The data documented that, in the two periods addressed in the document, year-to-date as of September 2006 and year-to-date as of September 2007, Fannie Mae's credit losses from EA and MCM far outweighed losses compared to the loans reported as the company's subprime exposure. As of September 2006, Fannie Mae had $80.6 million in losses from EA and $1.7 million in losses from MCM, compared to no losses from loans disclosed as subprime. As of September 2007, Fannie Mae had $188.9 million in

losses from EA, and $16 million in losses from MCM, compared to $5.5 million in losses from loans disclosed as subprime. Fannie Mae's credit losses from EA in 2006 and 2007 were overwhelmingly greater than any losses it experienced related to its disclosed subprime holdings during the same period. A key observation in the Report showed that the Company's highest risk products (which included EA and MCM loans) "comprise less than 15% of the S[ingle] F[amily] book but accounted for 57% of the $440MM" increase in credit losses.

119. Within two weeks, on November 9, 2007, Fannie Mae filed its Forms 10-Q for the first, second and third quarters of 2007. Even though each of the Defendants knew that EA and MCM loans fit Fannie Mae's public definition of subprime loans and were a source of credit losses far greater than losses triggered by the loans that were disclosed as subprime, EA or MCM loans were not included in the quantification of subprime. The Company stated in its first quarter Form 10-Q:

> A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or a subprime division of a large lender. ... Approximately 0.2% of our total single-family mortgage credit book of business as of March 31, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans. This percentage increased to approximately 0.3% as of September 30, 2007. Less than 1% of our single-family business volume for the nine months ended September 30, 2007 consisted of subprime mortgage loans or Fannie Mae MBS backed by subprime mortgage loans. (Emphasis added.)

120. The Company's subprime disclosures in its second and third quarter Forms 10-Q were comparable.

121.   The quantified subprime exposure omitted at least $43 billion worth of EA loans that were part of Fannie Mae's Single Family mortgage credit book of business and $17.6 billion in MCM loans as of March 31, 2007—approximately 12 times greater than the 0.2% ($4.8 billion) disclosed as "subprime mortgage loans or structured Fannie Mae MBS back by subprime loans" as of March 31, 2007.

122.   Nothing in Fannie Mae's public disclosures alerted investors to this much larger volume of loans that matched the Company's description of subprime loans but were not included in the reported subprime exposure.

123.   The November 9, 2007, Form 10-Q filings supplemented its prior public definition of subprime. In addition to stating that it classified "mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders," it also stated that it classified loans as subprime if the loans are originated by "a subprime division of a large lender."

124.   This statement in the November 9, 2007 Form 10-Q was false. In reality, Fannie Mae never tracked loans from the subprime divisions of large lenders and, accordingly, the Company never included any of those subprime loans in its reported subprime exposure—despite its explicit claim that it did so.

125.   Since at least 2003, Mudd was aware that subprime divisions of major lenders were originating and selling EA loans to Fannie Mae. Nevertheless, the Company never included any EA loans in its subprime reporting.

126.   In February 2007, Mudd traveled to meet with Fannie Mae's then-largest customer, Countrywide. At the meeting, Mudd was briefed by the President and COO of Countrywide Home Loans about the volume of loans Fannie Mae acquired from that customer's subprime lending division (Full Spectrum Lending), which between 2004 and 2006 totaled

34

$14.23 billion worth of loans. The presentation explicitly referred to Countrywide's subprime lending division customers as subprime "Fallen Angels."

127. In the Relevant Period alone, Fannie Mae acquired loans totaling approximately $28.5 billion from Countrywide's subprime division—the subprime division of a large lender. That number is far greater than the amount of "sub-prime mortgage loans or structured Fannie Mae MBS back by subprime mortgage loans" that Fannie Mae publicly disclosed to investors at any point during the Relevant Period.

128. Disclosing loans acquired from Countrywide's subprime division alone would have more than doubled the disclosed subprime exposure in Fannie Mae's Single Family guarantee portfolio. However, those loans were not included in the Company's reported subprime exposure.

129. During the Relevant Period, Fannie Mae purchased or securitized loans from subprime divisions of other large lenders including Citigroup, JPMorgan and GMAC.

130. Lund's direct reports knew and informed him that subprime divisions of large lenders sold loans to Fannie Mae—including Citi's Argent/Ameriquest, Countrywide's Full Spectrum Lending, and First Franklin's Flagstar bank.

131. On November 9, 2007, for the quarter ended September 30, 2007, Fannie Mae also filed a "credit supplement" on Form 8-K with the Commission. The document contained a summary description of certain credit risk characteristics of its Single Family book of business in chart form. Included in this chart were separate columns identifying Fannie Mae's subprime holdings and designating that 0.3% of its Single Family holdings were subprime loans. This supplemental disclosure did not inform investors of the additional subprime exposure from EA and MCM loans, or loans originated by the subprime divisions of large lenders. Fannie Mae

35

continued to issue credit supplements that were similarly false and misleading throughout the Relevant Period.

### *Mudd's False and Misleading Subprime Statements to the Media*

132.    On December 2, 2007, Mudd spoke about Fannie Mae's subprime holdings in a newspaper interview published in the San Francisco Gate.

> Q: We know you very well for the fact that you have well-underwritten loans, fully amortizing, and that you either keep these loans in portfolio or guarantee them. So how are you having involvement with these subprime loans at all?
>
> A: I'll give you two pieces to understand it. The notion that there is a delineation between a lower prime loan and a high subprime loan are incorrect. There's a FICO score, there's an LTV (loan to value) and a bunch of other factors. We have about 2 percent of our broker's business in total that meets our definition of what would be a subprime loan, not a predatory loan, but typically a loan to an individual that has had a credit blemish in the past. We made a decision a few years ago that there were lots of creditworthy individuals who had a credit blemish which would have previously either disqualified them from a prime loan, or condemn them to a subprime lender. They were probably eligible for what we call affordability product. So we have about 2 percent of that business on our books, and that is how our involvement happened.

133.    Mudd made these claims when he knew they were false and misleading. At the time that he made this statement, Mudd knew that the "2 percent" figure did not include billions of dollars in EA or MCM loans held by Fannie Mae. Mudd also knew that those undisclosed loans were specifically designed for "credit blemish[ed]" borrowers and that the figure could not reflect loans originated by the subprime division of large lenders, which by then the Company claimed to include in its reported subprime exposure.

### *Fannie Mae's False and Misleading Subprime Disclosures for Year-End 2007*

134.    In February 27, 2008, Fannie Mae issued its 2007 Form 10-K, which was identical to prior disclosures but further included the following statement:

> Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented less than 1% of our single-family business volume in each of 2007, 2006 and 2005. We estimate that subprime mortgage loans held in our

36

portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of December 31, 2007, compared with 0.2% and 0.1% as of December 31, 2006 and 2005, respectively.

135. Approximately $55.6 billion worth of Fannie Mae's Single Family mortgage credit book of business consisted of EA loans as of December 31, 2007, and $38.8 billion in MCM loans—approximately 11 times greater than the 0.3% ($8.3 billion) disclosed as "subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS" as of December 31, 2007.

136. Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

137. As of January 31, 2008, the serious delinquency rate of EA was 7.14%—performance that was worse than the disclosed subprime serious delinquency rate of 6.21% for the same period. By February 2008, it was clear from reports provided to all three defendants that credit losses from EA loans were "disproportionate to the amount of the book they constitute."

### *Fannie Mae's False and Misleading first and second quarter 2008 filings*

138. On May 6, 2008, Fannie Mae filed its Form 10-Q first quarter 2008 and stated:

Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS represented less than 1% of our single-family business volume for the first quarter of 2008 and 2007. We estimate that subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of both March 31, 2008 and December 31, 2007. (Emphasis added.)

37

139.    Approximately $101 billion worth of Fannie Mae's Single Family mortgage credit book of business of March 31, 2008, consisted of undisclosed loans that fell within the company's description of subprime, and approximately $94.4 billion worth of Fannie Mae's Single Family mortgage credit book of business consisted of undisclosed loans as of December 31, 2007—approximately 12 times greater than the 0.3% ($8 billion as of March 31, 2008 and $8.3 billion as of December 31, 2007) disclosed as "subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS" as of December 31, 2007.

140.    Nothing in Fannie Mae's public disclosures alerted investors that this much larger volume of loans matched the Company's description of subprime loans, but were not included in the reported quantitative number.

141.    By July 2008, Dallavecchia was emailing Mudd directly to highlight that EA and MCM were generating approximately 20% of the Company's credit losses.

142.    As of the beginning of August 2008, EA and MCM were classified in internal Fannie Mae documents as two of Fannie Mae's top three highest-risk loan products and Fannie Mae made plans to eliminate the EA loan program as part of an attempt to improve the overall credit quality of its Single Family book of business.

143.    This was not disclosed. Instead, on August 8, 2008, Fannie Mae filed its Form 10-Q for the second quarter 2008 and explained:

> Subprime mortgage loans, whether held in our portfolio or backing Fannie Mae MBS represented less than 1% of our single-family business volume for the first six months of 2008 and 2007. We estimate that subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by subprime mortgage loans, represented approximately 0.3% of our total single-family mortgage credit book of business as of both June 30, 2008 and December 31, 2007.

38

144. Approximately $60 billion worth of Fannie Mae's Single Family mortgage credit book of business consisted of EA loans and $41.7 billion in MCM loans as of June 30, 2008— approximately 12 times greater than the 0.3% ($8 billion) disclosed as "subprime mortgage loans held in our portfolio or subprime mortgage loans backing Fannie Mae MBS" as of both June 30, 2008 and December 31, 2007.

145. Nothing in Fannie Mae's public disclosures alerted investors to the fact this much larger volume of loans matched the Company's description of subprime loans but were not included in the reported quantitative number.

### *Mudd Publicly Declares that Fannie Mae has Zero Subprime*

146. On August 20, 2008, Mudd falsely stated in a radio interview: Fannie Mae has "about zero percent" exposure to subprime loans, and "[s]ubprime to Fannie Mae means a loan to a borrower that has had a credit problem in the past." When Mudd made this statement, he knew that Fannie Mae had substantial exposure to loans made to borrowers who have had a credit problem in the past.

### *Post-conservatorship Fannie Mae Acknowledges Additional Subprime Holdings*

147. After Fannie Mae had been placed into conservatorship on September 6, 2008, the Company made a disclosure that highlights the misleading nature of the Company's prior subprime reports. At the time this disclosure was made, neither Mudd nor Dallavecchia were at Fannie Mae and Lund, who remained EVP of the Single Family business until June 2009, was no longer a member of the Disclosure Committee.

148. On November 10, 2008, Fannie Mae filed its Form 10-Q for the third quarter and stated:

39

We have classified mortgage loans as subprime if the mortgage loan is originated by a lender specializing in subprime business or by subprime divisions of large lenders. We apply these classification criteria in order to determine our ... subprime loan exposures; however, we have other loans with some features that are similar to ... subprime loans that we have not classified as ... subprime because they do not meet our classification criteria. (Emphasis added).

149.    In this statement, for the first time the Company publicly acknowledged what Mudd, Lund and Dallavecchia had known throughout the Relevant Period; namely, that Fannie Mae held loans squarely within the public definition of subprime that it had not included in calculating its publicly disclosed exposure to subprime loans.

150.    Based on the facts alleged above, Mudd, Lund and Dallavecchia, knew or were reckless in not knowing that Fannie Mae's statements disclosing its subprime holdings, and as to Mudd and Dallavecchia, their respective statements regarding Fannie Mae's subprime holdings, were false and misleading.

## FANNIE MAE'S ALT-A DISCLOSURE FRAUD

### Fannie Mae Increases Market Share By Acquiring Reduced Documentation Alt-A Loans

151.    Fannie Mae acquired increasing amounts of reduced documentation loans. Prior to 2000, Fannie Mae had a limited market presence in purchasing reduced documentation loans, and those loans were not a large part of mortgage originations nationwide. This changed during the 2000s, and by 2007, reduced documentation loans were surging in popularity, representing approximately 40% of mortgage loan originations nationwide.

152.    Traditionally, Fannie Mae's MBS dominated the nationwide mortgage-related securities market. However, by 2005, private label competition for mortgage-backed securities overtook Fannie Mae's MBS market dominance; as a result, Fannie Mae's nationwide share of mortgage loan originations fell from 40% in 2004 to 20% in 2005.

40

153.    In response, at the end of 2005, Fannie Mae's board of directors instructed the Single Family business to adjust its business plan to gain back market share. The goal was to increase Single Family's purchases from 20% of total mortgage loan originations to at least 25% by the end of 2006. In an April 2006 meeting, Mudd directed the Single Family business to acquire more reduced documentation loans specifically, saying: "the market is moving to low documentation and we need to actively pursue the keys to this market."

154.    Fannie Mae's push to increase its reduced documentation loans was dramatic. At the end of 2004, reduced documentation loans constituted 17.8% of Fannie Mae's Single Family loan acquisitions: by year-end 2005 that number was 20.2%, and by year-end 2006, 27.8% of Fannie Mae's Single Family loan acquisitions were reduced documentation loans. This represented a nearly 40% increase from 2005 and a greater than 50% increase from 2004.

### Fannie Mae Internally Tracked Its Loans With Low Or Alternative Documentation Requirements As Reduced Documentation Loans

155.    As described in internal Company records, documentation level is a key credit risk characteristic of a loan. Because Alt-A loans do not require that a borrower fully document their income, assets and/or employment, Alt-A loans have a greater risk of default than fully documented loans. Fannie Mae executives—including Mudd, Lund and Dallavecchia—regularly monitored the total reduced documentation loan acquisition trends at the Company and the attendant credit risk those loans presented via internal reports.

156.    Mudd, for example, was well aware of the Company's increased acquisition of reduced documentation loans. An April 26, 2006 CEO credit risk briefing stated that of all loans acquired by Fannie Mae's Single Family business, 20.2% were reduced documentation loans at year-end 2005, and this number increased to 23.5% of acquisitions by February 2006. That same report noted that credit risks (such as reduced documentation) are a strong predictor of serious

delinquency within the first year of a loan's acquisition and therefore present significant credit risk.

157.    Similarly, at the beginning of his tenure as CRO of Fannie Mae in June 2006, Dallavecchia was briefed on Fannie Mae's increasing stake in reduced documentation loans. Dallavecchia received a credit risk briefing that explained: Fannie Mae's Single Family business has seen an increase in "potentially riskier products like ... low documentation loans ... [and] Alt-A loans as a percent of total acquisitions increased from 11.5% in 2002 to 20.2% in 2005." That same presentation described this increase as an acquisition "trend" and noted Fannie Mae's Single Family plan for an "Alt-A push. Goal of $60B in 2006."

158.    As a member of the Disclosure Committee, throughout the fall of 2006, Dallavecchia received draft versions of Fannie Mae's 2004 Form 10-K, which contained detailed acquisition data concerning reduced documentation mortgages, including quantitative exposure data that showed reduced documentation mortgages "represented approximately 18%, 20% and 24% of our single-family acquisitions in 2004, 2005, and the first half of 2006."

159.    Likewise, throughout the Relevant Period, as EVP of the Single Family business, Lund was aware of Fannie Mae's increasing exposure to Alt-A loans. He received monthly reports that presented Fannie Mae's total reduced documentation loan exposure, which between 2006 and 2008 ranged from 13% to 21% of the Single Family mortgage book of business. Those loan acquisition reports were sometimes called the "Tom Lund Report."

160.    During the Relevant Period, Lund's Single Family officers—from his Single Family Credit Risk officers to Product Management and Development executives—routinely prepared presentations and reports concerning not only Fannie Mae's increasing acquisitions of reduced documentation loans, but also the credit risks associated with those loans, including their

expected and actual SDQ rates. As the head of the Single-Family business, Lund had access to data and information prepared by his officers, as well as Early Warning reports—all of which conveyed, as described by his staff: "Low doc is more likely to default than full doc."

*Fannie Mae Failed to Report All The Reduced Documentation Loans
That It Tracked Internally for Credit Risk Monitoring Purposes*

161.    In its public filings, when it publicly disclosed the amount of reduced or alternative documentation loans it held, the Company did not report all of the reduced documentation loans that it tracked internally as one of seven key credit risks.

162.    Each of the Defendants knew that approximately half of the reduced documentation loans in the Single Family book were not included when the Company reported its Alt-A loans.

163.    When the Company internally tracked its reduced documentation loans it included loans that it referred to as "Special Lender Programs" or Lender-Selected loans. These were loans in which the lender ostensibly initiated the reduced documentation option for processing the loan. The Company also tracked "Other Low/No Doc loans," which are Borrower-Selected loans, or loans in which borrowers specifically requested loans for which minimal documentation was required.

164.    When the Company reported its Alt-A holdings it failed to disclose all its reduced documentation loans: it disclosed Borrower-Selected loans but did not report its Lender-Selected loans. This limited disclosure misrepresented the extent of Fannie Mae's total exposure to reduced documentation loans.

165.    On average throughout the Relevant Period, Lender-Selected Reduced Documentation Loans—the undisclosed Alt-A loans—had SDQ rates that were 1.4 times higher than full documentation loans with otherwise similar credit risks. Moreover, during the Relevant Period, certain types of Lender-Selected Reduced Documentation Loans that Fannie Mae acquired, such as Countrywide's *Fast and Easy* loans, had SDQ rates that were 2 times higher than full documentation loans with otherwise similar credit risks.

44

166.    Fannie Mae's Alt-A disclosure misrepresented the extent of its reduced documentation high risk holdings as evidenced by the undisclosed loans from a single source of Lender-Selected reduced documentation loans. At year-end 2006, Fannie Mae had $102.5 billion worth of *Fast and Easy* loans alone on its Single Family book of business, which grew to $129.2 billion by year-end 2007, and by the end of the third quarter of 2008, Fannie Mae had $133.4 billion worth of *Fast and Easy* loans on its Single Family book of business. None of these loans, or other similar Lender-Selected reduced documentation loans, were ever disclosed to investors when the Company quantified its Alt-A exposure.

167.    This single unreported Alt-A product from one customer—Countrywide—accounted for 4.63% of Fannie Mae's 2006 Single Family business, 5.10% in 2007 and 4.94% as of September 2008. As one of Lund's officers stated in a presentation: "CHL [Countrywide] sells whatever it can through Fast & Easy."

### *Fannie Mae Failed To Disclose That*
### *The Company Directed Lenders When To Classify Loans as Alt-A*

168.    Fannie Mae stated that it classified loans as "Alt-A if the lender that delivers the mortgage loans to us has classified the loans as Alt-A based on documentation or other product features." This reporting materially understated the extent of Fannie Mae's total exposure to reduced documentation loans.

169.    Fannie Mae did not disclose that the Company directed lenders that delivered the mortgage loans to Fannie Mae's lender channel whether to label reduced documentation loans as Alt-A or not. The Alt-A classification, in practice, came from Fannie Mae and was executed by the originating lenders; the lenders did not make the coding determination.

170.    Fannie Mae had contractual agreements with lenders that included instructions on when to code reduced documentation loans for delivery through its Lender Channel as Alt-A.

Occasionally, when a customer delivered loans to Fannie Mae's Lender channel with an Alt-A code that Fannie Mae had not prescribed for delivery for that loan type, Fannie Mae would instruct the customer to re-code its loans to remove the Alt-A code prior to accepting delivery.

171. Fannie Mae determined whether the lender classified the loan as Alt-A rather than accepting an Alt-A classification as designated by a lender

### Fannie Mae Issues a Series of False and Misleading Disclosures on Alt-A

172. In its 2004 Form 10-K, which was filed on December 6, 2006, the Company disclosed that it had increased its holdings of reduced documentation loans, but did not quantify those holdings:

> We also have increased the proportion of reduced documentation loans that we purchase . . . we began to increase our participation in these product types where we concluded that it would be economically advantageous or that it would contribute to our mission objectives ... In addition, there has been an increasing industry trend towards streamlining the mortgage loan underwriting process by reducing the documentation requirements for borrowers. Reduced documentation loans in some cases present higher credit risk than loans underwritten with full standard documentation.

173. In its discussion of Alt-A, Fannie Mae did not disclose that the amount of "loans that are underwritten with lower or alternative documentation" in the Single Family mortgage credit book of business was $390 billion as of September 30, 2006, or the fact that by June 30, 2006, approximately 24% of Fannie Mae's Single Family loan acquisitions were reduced documentation loans.

174. As Fannie Mae prepared to file its 2005 Form 10-K in February 2007, Single Family officers working on the credit risk disclosures voiced concern: "Given Alt-A is an increasing as part of our business [sic] strategy and volume and this is the 2005 disclosure it seems to warrant more than a fairly benign reference, as is the case in the 2004 disclosure ... The decision now may very well be not to include numbers for this segment and just disclose an

increasing trend in words, but by the time we are done with 2006 we need to reflect the reality of the business."

175. During this time period, senior management at Fannie Mae recognized that investors wanted to know the Company's Alt-A exposure. In April 2007, the director of Investor Relations at Fannie Mae wrote an email acknowledging, "In anticipation of IR's 2005 10-K briefing with Dan and Bob tomorrow, we would like to get your direction on how management should address questions related to FNMs exposure to Alt-A product … we expect the question to be asked and need to plan for it." (Emphasis added).

*Fannie Mae's False and Misleading Alt-Disclosures in its May 9, 2007
Form 12b-25 Filing*

176. On May 9, 2007, for the first time, Fannie Mae disclosed a quantification of its Alt-A holdings in its Form 12b-25 filing. The Company defined Alt-A as loans with "lower or alternative documentation" and disclosed that it held 11% of Alt-A in its Single Family mortgage credit book of business. Fannie Mae stated:

> Although there is no uniform definition of Alt-A … [Alt-A] loans generally are loans that are underwritten with lower or alternative documentation than a full documentation mortgage loan and that also may include other alternative features … In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features, or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as Alt-A when sold. We estimate that approximately 11% of our total single-family mortgage credit book of business as of both March 31, 2007 and December 31, 2006 consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans … As described below in the discussion of our Capital Markets group, we also have invested in highly rated private-label mortgage-related securities backed by Alt-A loans. We estimate that approximately 1% of our total single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans as of both March 31, 2007 and December 31, 2006. (Emphasis added.)

47

177.   The amount of Alt-A Fannie Mae publicly disclosed did not include the "lower or alternative documentation loans" that were internally referred to as Lender-Selected reduced document loans. Yet nothing in Fannie Mae's public disclosures alerted investors to the fact that a much larger volume of loans that matched the Company's description of its Alt-A holdings were excluded from the amount of Alt-A that the Company disclosed.

178.   Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 20.7% and 20.1% of its total Single Family mortgage credit book of business at March 31, 2007, and December 31, 2006, respectively, not 11% as disclosed. Fannie Mae's reporting of its Alt-A mortgage loans omitted approximately $219 billion and $201 billion worth of Fannie Mae's Single Family mortgage credit book of business which consisted of reduced documentation loans as of March 31, 2007, and December 31, 2006, almost equal to the volume of Single Family loans ($263 billion and $257 billion) that were disclosed as Alt-A.

### Fannie Mae's False and Misleading Alt-A Disclosures in its 2006 Form 10-K

179.   In June 2007, Lund's Single Family personnel prepared Single Family Credit Committee presentation materials, which acknowledged that, for internal Fannie Mae calculations, Fannie Mae's undisclosed Alt-A loan programs were treated as reduced documentation loans, not full document loans.

180.   Even though senior management, including Mudd, Lund and Dallavecchia, recognized that Fannie Mae had an increasing volume of reduced documentation loans that performed as poorly as some loans disclosed as Alt-A, none of these loans were disclosed. On August 16, 2007, in its 2006 Form 10-K, the Company stated:

> *"Alt-A mortgage"* generally refers to a loan that can be underwritten with lower or alternative documentation than a full documentation mortgage loan but may also include other alternative product features. As a result, Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans. In

48

reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features, or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as Alt-A when sold ...We estimate that approximately 11% of our total single-family mortgage credit book of business as of December 31, 2006 consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans. This percentage increased to approximately 12% as of June 30, 2007 ... We estimate that private label mortgage-related securities backed by Alt-A loans ... accounted for approximately 1% (and 2% respectively) ... of our single-family mortgage credit book of business as of June 30, 2007. (Emphasis added.)

181.    At the time of this disclosure, Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 22% of its total Single Family mortgage credit book of business, not 12% as disclosed. Fannie Mae's reporting of its Alt-A omitted approximately $238 billion worth of Fannie Mae's Single Family mortgage credit book of business, which consisted of reduced document loans as of June 30, 2007— almost equal to the $296 billion that was disclosed as Alt-A.

### Fannie Mae's False and Misleading Alt-A Disclosures in its first, second and third quarter 2007 10-Qs

182.    By October 2007, reduced documentation loans comprised 29.1% of Fannie Mae's Single Family loan acquisition volume and 22% of the Single Family mortgage credit book of business.

183.    Nevertheless, on November 9, 2007, in its 2007 Forms 10-Q for the first quarter, the Company disclosed:

As of March 31, 2007, we estimate that approximately 11% of our total single-family mortgage credit book of business consisted of Alt-A mortgage loans or Fannie Mae MBS backed by Alt-A mortgage loans. This percentage increased to approximately 12% as of September 30, 2007 ... As of March 31, 2007, we held in our investment portfolio approximately $34.5 billion in private-label mortgage-related securities backed by Alt-A mortgage loans.

49

184.    On that same day, November 9, 2007, Fannie Mae also filed its 2007 Forms 10-Q for the second and third quarter, the Alt-A disclosures for which were comparable to the 2007 Form 10-Q for the first quarter.

185.    Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 22% of its total Single Family mortgage credit book of business, not 12% as disclosed. Fannie Mae's reporting of its Alt-A omitted approximately $267 billion worth of Fannie Mae's Single Family mortgage credit book of business which consisted of reduced document loans as of September 30, 2007— almost equal to the $306 billion that was disclosed as Alt-A.

186.    On November 9, 2007, for the quarter ended September 30, 2007, Fannie Mae also filed a Form 8-K credit supplement with the Commission. The document contained a summary description of certain credit risk characteristics of its Single Family book of business in chart form. Included in this chart was a separate column identifying Fannie Mae's Alt-A holdings, and designating that 12.5% of its Single Family mortgage credit book of business were Alt-A loans. Nowhere in this supplemental disclosure was there any statement to suggest that Single Family holdings included billions of dollars of additional reduced documentation loans that were not reflected in the 12.5% figure. Fannie Mae continued to issue credit supplements that were similarly misleading throughout the Relevant Period.

*Fannie Mae's False and Misleading Disclosure in its Year-End 2007 10-K Filing*

187.    On February 27, 2008, in its 2007 Form 10-K, the Company repeated its prior statement on Alt-A and updated its reporting as follows:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS, represented approximately 16% of our single-family business volume in 2007, compared with approximately 22% and 16% in 2006 and 2005, respectively.

188.    Fannie Mae's total volume of loans with "lower or alternative documentation" (Alt-A) was actually 37% of its Single Family acquisitions, not 16% as disclosed.

189.    On May 6, 2008, in its 2008 Form 10-Q for the first quarter, the Company stated:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS represented approximately 4% of our single-family business volume for the first quarter of 2008, compared with approximately 23% for the first quarter of 2007. Alt-A mortgage loans held in our portfolio or Alt-A mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by Alt-A mortgage loans, represented approximately 11% of our total single-family mortgage credit book of business as of March 31, 2008, compared with approximately 12% as of December 31, 2007.

190.    Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 22% of its total Single Family mortgage credit book of business, not 11% as disclosed. Fannie Mae's reporting of its Alt-A loans omitted approximately $323 billion worth of mortgage loans in Fannie Mae's Single Family mortgage credit book of business that consisted of reduced document loans as of March 31, 2008— more than the $300 billion that was disclosed as Alt-A.

191.    As of December 2007, 23% of Fannie Mae's Single Family mortgage credit book of business consisted of reduced documentation loans, not the 11% reported in the public filing.

192.    Approximately two and a half months after the 2008 Form 10-Q filing, in July 29, 2008, Lund held a staff meeting which addressed issues related to reduced documentation loans. Countrywide's *Fast and Easy* program—a Lender-Selected loan program whose loans were tracked as a reduced document high risk loan internally but excluded from Fannie Mae's public disclosure of its Alt-A exposure— was specifically discussed in the presentation. The briefing addressed that these loans performed as poorly as some loans that were disclosed as Alt-A.

Despite this knowledge, *Fast and Easy* loans were not disclosed as part of Fannie Mae's Alt-A exposure, and Lund continued to sub-certify Fannie Mae's public statements.

193. By August 2008, and before the filing of its 2008 Form 10-Q for the second quarter, Fannie Mae was planning to eliminate its high risk products, including Alt-A. The Company still did not disclose its total Alt-A loans.

194. On August 8, 2008, in its 2008 Form 10-Q for the second quarter, its final filing before conservatorship, the Company stated:

> Alt-A mortgage loans, whether held in our portfolio or backing Fannie Mae MBS represented approximately 4% of our single-family business volume for the first six months of 2008, compared with approximately 22% for the first six months of 2007 ... Alt-A mortgage loans held in our portfolio or Alt-A mortgage loans backing Fannie Mae MBS, excluding resecuritized private-label mortgage-related securities backed by Alt-A mortgage loans, represented approximately 11% of our total single-family mortgage credit book of business as of June 30, 2008, compared with approximately 12% as of December 31, 2007.

195. Fannie Mae's total exposure to loans with "lower or alternative documentation" (Alt-A) was actually 23% of its total Single Family mortgage credit book of business, not 11% as disclosed. Fannie Mae's reporting of its Alt-A omitted approximately $341 billion worth of Fannie Mae's Single Family mortgage credit book of business which consisted of reduced documentation loans as of June 30, 2008—more than the $306 billion that was disclosed as Alt-A to investors on August 8, 2008.

### *Post-conservatorship Fannie Mae Acknowledges Additional Alt-A Holdings*

196. In its first periodic filing post-conservatorship, Fannie Mae made a disclosure that highlights the misleading nature of the Company's prior Alt-A disclosures. At the time this disclosure was made neither Mudd nor Dallavecchia were at Fannie Mae, and Lund, who remained EVP of the Single Family business, was no longer a member of the Disclosure Committee. The Company explained:

We have classified mortgage loans as Alt-A if the lender that delivers the mortgage to us has classified the loans as Alt-A based on documentation or other features … We apply these classification criteria in order to determine our Alt-A … loan exposure[ ]; however, we have other loans with some features that are similar to Alt-A … that we have not classified as Alt-A … because they do not meet our classification criteria. (Emphasis added.)

197.  In this statement for the first time the Company publicly acknowledged what Mudd, Lund and Dallavecchia had known throughout the Relevant Period, that it held loans that matched its public definition of Alt-A, but had not included them when reporting its Alt-A exposure:

198.  Based on the facts alleged above, Mudd, Lund and Dallavecchia, knew or were reckless in not knowing that Fannie Mae's statements reporting Alt-A were false and misleading.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b)
## (MUDD)

1.  Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

2.  Mudd directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Fannie Mae securities, knowingly or recklessly, has made untrue statements of material facts or omitted to state material facts necessary in order to make statement made, in the light of the circumstances under which they were made, not misleading.

3.  By reason of the foregoing, Mudd directly or indirectly has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rules 10b-5(b) thereunder (17 C.F.R. § 240.10b-5(b)).

### SECOND CLAIM FOR RELIEF
### VIOLATION OF SECTION17(A)(2) OF THE SECURITIES ACT
### (MUDD AND DALLAVECCHIA)

4.     Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

5.     Mudd and Dallavecchia, directly or indirectly, in the offer and sale of Fannie Mae securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly, recklessly or negligently have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

6.     By reason the foregoing, Mudd and Dallavecchia have violated, and unless enjoined will again violate, Sections 17(a)(2) of the Securities Act (15 U.S.C. § 77q(a)(2)).

### THIRD CLAIM FOR RELIEF
### AIDING AND ABETTING VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE10b-5(b)
### (MUDD, DALLAVECCHIA AND LUND)

7.     Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

8.     Fannie Mae and Mudd, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Fannie Mae securities, knowingly or recklessly, has made untrue statements of material facts or omitted to state material facts necessary in order to make statement made, in the light of the circumstances under which they were made, not misleading.

9.     Mudd, Dallavecchia and Lund acted knowingly or recklessly and provided substantial assistance to and thereby aided and abetted Fannie Mae in its violations of Exchange Act Section 10(b) and Rule 10b-5(b); [17 C.F.R. § 240.10b-5(b)]; therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

10.     Dallavecchia and Lund acted knowingly or recklessly and provided substantial assistance to and thereby aided and abetted Mudd in his violations of Exchange Act Section 10(b) and Rule 10b-5(b); [17 C.F.R. § 240.10b-5(b)]; therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

11.     Unless restrained and enjoined, Mudd, Dallavecchia and Lund will continue to aid and abet violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rules 10b-5(b) thereunder (17 C.F.R. § 240.10b-5(b)).

### FOURTH CLAIM FOR RELIEF
#### VIOLATION OF EXCHANGE ACT RULE 13a-14(A)
##### (MUDD)

12.     Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

13.     On December 6, 2006, May 2, 2007, August 16, 2007, and February 27, 2008, Mudd signed false certifications of Fannie Mae Forms 10-K, and on November 9, 2007, May 6, 2008, and August 8, 2008, Mudd signed false certifications of Fannie Mae Forms 10-Q. Each of those Forms 10-K and Forms 10-Q certifications Mudd made were pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14(a) promulgated thereunder. His certifications falsely stated that: he had reviewed each report; based upon his knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not

55

misleading; and based upon his knowledge, the financial statements and information contained in each report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant.

14.     By reason of the foregoing, Mudd violated, and unless restrained and enjoined will continue to violate, Exchange Act Rule 13a-14(a) (17 C.F.R. § 240.13a-14) promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

### FIFTH CLAIM FOR RELIEF
#### AIDING AND ABETTING VIOLATIONS OF SECTION 13(A) OF THE EXCHANGE ACT AND RULES 12B-20, 13A-1 AND 13A-13 (MUDD, DALLAVECCHIA AND LUND)

15.     Paragraphs 1 through 198 are realleged and incorporated by reference as if set forth fully herein.

16.     Section 13(a) of the Exchange Act and Rule 13a-1 and Rule 13a-13 thereunder requires issuers of registered securities to file with the Commission factually accurate current and quarterly reports.  Exchange Act Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

17.     Fannie Mae violated Exchange Act § 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 (17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13).

18.     By reason of the foregoing, Mudd, Dallavecchia and Lund acted knowingly or recklessly and provided substantial assistance to and thereby aided and abetted Fannie Mae's violations of Section 13(a) of the Exchange Act (15 U.S.C. § 78m(a)) and Exchange Act Rules 12b-20, 13a-1 and 13a-13 (17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13); therefore, each is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

(a)    Permanently restrain and enjoin defendant Mudd from violating Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. §77q(a) ("the Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) ("the Exchange Act") and Exchange Act Rule 10b-5, 17 C.F.R. §240.10b-5, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Exchange Act Rules 12b-20 and 13a-13,17 C.F.R. §§ 240.12b-20, 240.13a-13 and  Exchange Act  Rule 13a-14(a) (17 C.F.R. § 240.13a-14), and aiding and abetting Fannie Mae's violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

(b)    Permanently restrain and enjoin defendant Dallavecchia from violating Section 17(a)(2) of the Securities Act, aiding and abetting Fannie Mae's and Mudd's violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, and aiding and abetting Fannie Mae's violation of  Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13.

(c)    Permanently restrain and enjoin defendant Lund from aiding and abetting Fannie Mae's and Mudd's violations of Section 10(b) and Rule 10b-5, aiding and abetting Fannie Mae's violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13.

(d)    Order defendants Mudd, Dallavecchia and Lund to pay disgorgement, together with prejudgment interest;

(e)    Order defendants Mudd, Dallavecchia and Lund to pay penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

(f)      Permanently bar defendants Mudd, Dallavecchia and Lund, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act (15 U.S.C. § 78u(d)(2)), from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act (15 U.S.C. § 78l) or that is required to file reports pursuant to Section 15(d) of the Exchange Act (15 U.S.C. § 78o(d)); and

(g)    Grant such other relief as this Court may deem necessary and proper.

Dated:  December __16__ , 2011

Washington, D.C.

Respectfully Submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By:    _____

Natasha S. Guinan (4320636)
Sarah L. Levine
James A. Kidney
Stephen L. Cohen
Charles E. Cain

100 F Street, N.W.
Washington, D.C. 20549
Tel.:         (202) 551-4572 (Guinan)
Fax:         (202) 772-9236 (Guinan)
E-mail:      GuinanN@sec.gov



# 11 CIV 9201

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 11-cv-_____ |
| Plaintiff, | ECF CASE |
| v. | (Jury Trial Demanded) |
| RICHARD F. SYRON, PATRICIA L. COOK, and DONALD J. BISENIUS, | |
| Defendants. | |

APR 18 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission"), alleges for its

Complaint as follows:

### SUMMARY OF ALLEGATIONS

1.      This action arises out of a series of materially false and misleading public disclosures by the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") and certain of its senior executives relating to the exposure of Freddie Mac's largest business segment – Single Family Guarantee – to subprime mortgage loans.

2.      Between March 23, 2007, and August 6, 2008 (the "Relevant Period"), a period of heightened investor interest in the credit risks associated with subprime loans, Freddie Mac and defendants Richard F. Syron ("Syron"), Patricia L. Cook ("Cook"), and Donald J. Bisenius ("Bisenius") misled investors into believing that the Company had far less exposure to these riskier mortgages than in fact existed. To that end, at various times, each made or substantially assisted Freddie Mac and each other in making materially false and misleading statements that

claimed in substance that Freddie Mac had little or no exposure to subprime loans in its Single Family Guarantee business.

3.    While Freddie Mac disclosed during the Relevant Period that the exposure of its Single Family Guarantee business to subprime loans was between $2 billion and $6 billion, or between 0.1 percent and 0.2 percent, of Freddie Mac's Single Family Guarantee portfolio – its exposure to subprime was materially greater.  As of December 31, 2006, Freddie Mac's Single Family Guarantee business was exposed to approximately $141 billion (or 10 percent of the portfolio) in loans the Company internally referred to as "subprime," "otherwise subprime" or "subprime-like" and its exposure grew to approximately $244 billion (or 14 percent of the portfolio) by June 30, 2008, as the Company sought to win back lost market share by increasing its acquisition of such loans.

4.    Syron had ultimate authority over the subprime disclosures in Freddie Mac's Information Statements and supplements to the Information Statements published between March 23, 2007 and May 14, 2008, and in its Form 10-Q filed with the Commission on August 6, 2008, and also in speeches he gave or public statements he made in 2007 and 2008.  Cook spoke at an investor conference on May 17, 2007, in which she told investors that Freddie Mac had "basically no subprime exposure" and she provided substantial assistance to Syron and Freddie Mac in making subprime disclosures in the Information Statements and supplements and a Form 10-Q by certifying to the accuracy of the disclosures, which related to her area of responsibility.  Bisenius also certified to the accuracy of the subprime disclosures in certain Information Statements and supplements published during the Relevant Period and the Form 10-Q and thus substantially assisted Syron and Freddie Mac in making the misleading statements in these documents; he also substantially assisted Syron and Cook in making oral misstatements

2

about subprime by failing to correct statements in their prepared speeches that he knew misstated the Company's subprime exposure. Each defendant made, or substantially assisted others in the making of, these misleading subprime disclosures at a time when each knew, or was reckless in not knowing, that the Company was increasing its acquisition of higher-risk loans that it internally referred to as "subprime," "otherwise subprime" or "subprime-like."

5.     By this conduct, Syron and Cook violated, and Syron, Cook and Bisenius aided and abetted violations of, the antifraud and reporting provisions of the federal securities laws.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

7.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

8.     In connection with the transactions, acts, practices and courses of business alleged in this Complaint, Syron, Cook and Bisenius have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## RELEVANT ENTITY

9.     **Freddie Mac** was, at all times relevant to this Complaint, a shareholder-owned Government Sponsored Enterprise ("GSE") established by the U.S. Congress on July 24, 1970, with the passage of the Federal Home Loan Mortgage Corporation Act (the "FHLMC Act"), to provide a continuous flow of funds for residential mortgages. Freddie Mac performed this function by buying and guaranteeing residential mortgage loans and mortgage-related securities, which it financed by issuing mortgage-related securities, debt securities and equity securities. Under the FHLMC Act, the Company's securities were "exempt securities," meaning they were exempt from the registration and disclosure requirements of the federal securities laws. On July 18, 2008, Freddie Mac voluntarily registered its common and preferred stock under Section 12(g) of the Exchange Act by filing a Form 10 registration statement with the Commission. Prior to July 18, 2008, Freddie Mac publicly disseminated annual and quarterly reports of its financial condition and results of operations in Information Statements and Information Statement Supplements, which were virtually identical in presentation to annual and quarterly reports filed with the Commission by registrants. Since July 18, 2008, Freddie Mac has been subject to the reporting requirements of the federal securities laws. During the Relevant Period, Freddie Mac's common stock was actively traded on the New York Stock Exchange under the ticker symbol "FRE." Its principal place of business was, and is, in McLean, Virginia.

10.     Freddie Mac manages its business through three reportable segments: (i) Single Family Guarantee ("Single Family"), (ii) Investments, and (iii) Multifamily.

11.     Single Family is Freddie Mac's primary business segment. During the Relevant Period, Freddie Mac reported that the size of its Single Family business was $1.4 trillion as of December 31, 2006, $1.7 trillion as of December 31, 2007 and $1.8 trillion as of June 30, 2008.

4

12.    Through its Single Family business, Freddie Mac purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them as Freddie Mac mortgage-backed securities, known as Participation Certificates ("PCs"). Freddie Mac guarantees the payment of principal and interest on the mortgage loans that underlie these PCs in exchange for guarantee fees.

13.    During the Relevant Period, Freddie Mac completed at least four preferred stock offerings, raising approximately $7.5 billion: (i) pursuant to an Offering Circular dated April 10, 2007, it issued $500 million worth of 5.66 percent non-cumulative perpetual preferred stock, (ii) pursuant to an Offering Circulated dated July 17, 2007, it issued $500 million worth of 6.02 percent non-cumulative perpetual preferred stock, (iii) pursuant to an Offering Circular dated September 25, 2007, it issued $500 million of 6.55 percent non-cumulative perpetual preferred stock and (iv) pursuant to an Offering Circular dated November 29, 2007, it issued $6 billion fixed-to-floating rate non-cumulative perpetual preferred stock. Additionally, in mid-2008, Freddie Mac executives attempted to make at least one additional preferred stock offering in the amount of $5.5 billion. Throughout the Relevant Period, Freddie Mac also routinely issued debt securities.

14.    On September 6, 2008, following mounting losses, Freddie Mac's primary regulator, the FHFA, placed it into conservatorship. On September 7, 2008, FHFA, as conservator, adopted a resolution eliminating the par value of Freddie Mac's common stock, increasing the number of shares of Freddie Mac common stock authorized for issuance to four billion, preventing Freddie Mac from making any payment to purchase or redeem its capital stock or pay any dividends to holders of Freddie Mac's common stock, and limiting the voting rights of holders of Freddie Mac's common stock.

**DEFENDANTS**

15.    **Richard F. Syron**, age 68, was Chairman of the Board of Directors ("Chairman")

and Chief Executive Officer ("CEO") of Freddie Mac from December 2003 until September 7,

2008, when Freddie Mac's regulator, the Federal Housing Finance Agency ("FHFA"), placed it

into conservatorship. Syron's compensation grew from approximately $14.7 million in 2006 to

$18.3 million in 2007 – tied, in part, to the "Touch More Loans" initiative discussed further

below in Paragraph 45 and to quarterly financial reporting. Syron formally ceased to be an

employee of Freddie Mac on November 7, 2008, and was deemed to have resigned from the

Board of Directors, effective as of that date. Syron is a resident of Massachusetts.

16.    As Chairman and CEO of Freddie Mac, Syron oversaw all three of Freddie Mac's

reportable segments, including Single Family. As Chairman, Syron was a regular attendee at

Board meetings and Board committee meetings, including the Board's Mission, Sourcing and

Technology Committee meetings. As CEO, he chaired a team that he personally selected from

the upper echelons of executive management called the "SET" or "Senior Executive Team,"

which met periodically to consider Freddie Mac's strategic direction. Syron also regularly

attended monthly meetings of the Enterprise Risk Management Committee (the "ERMC"),

which was a committee comprised of executives and senior management from Freddie Mac's

three reportable segments that considered the status of credit, market and operational risks,

among others, to the Freddie Mac enterprise. Syron received monthly materials from the ERMC

that apprised him of the credit, market and operational risks, among others, to the Freddie Mac

enterprise. Syron also attended meetings of the ERMC.

17.    Syron had extensive knowledge and experience in housing market-related issues.

He wrote a dissertation about the housing market and served in various leadership positions at

6

both the Federal Reserve Bank of Boston and the Federal Home Loan Bank of Boston, including President and CEO. Syron was knowledgeable about the housing market and mortgage-related risks, and familiar with the views held by other market participants.

18. Syron regularly received and reviewed drafts of the Freddie Mac Information Statements and Annual Reports to Stockholders ("Information Statements") and supplements to the Information Statements ("Information Statement Supplements") and, once Freddie Mac became an SEC-reporting company, drafts of Freddie Mac's first Form 10-Q. Syron certified Freddie Mac's Information Statements and Supplements published between March 23, 2007 and May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008.

19. Patricia L. Cook, age 58, was an officer of Freddie Mac and held several titles, including Executive Vice President ("EVP") of Investments and Capital Markets and Chief Business Officer ("CBO"), from August 2004 through September 26, 2008. Cook's compensation was $4.9 million in 2006 and $4.8 million in 2007 – tied, in part, to the Touch More Loans strategy discussed below in Paragraph 45 and to quarterly financial reporting. Cook formally ceased to be an employee of the Company on November 17, 2008, approximately two months after the Company announced certain management and organizational changes, including the elimination of her position. Cook is a resident of Washington, D.C.

20. As EVP of Investments and Capital Markets and as CBO, Cook oversaw Single Family. Cook attended Board meetings and Board committee meetings, including the Board's Mission, Sourcing and Technology Committee meetings. Cook was one of the senior executives who served on Syron's SET. She also attended or, on occasion, sent representatives on her behalf, to the monthly ERMC meetings. She received materials from the ERMC that apprised her of the credit, market and operational risks, among others, to the Freddie Mac enterprise. As

7

the senior executive in charge of the Single Family business, Cook was knowledgeable about Freddie Mac's acquisitions and the performance of Freddie Mac's high risk loan portfolio, including certain loans the Company internally considered to be subprime.

21. The Touch More Loans strategy, discussed below in Paragraph 45, also played a role in Cook's compensation. In 2006, Cook's target bonus was $2 million and her target long-term equity award for performance was $2.4 million. Cook received a bonus of $2.3 million, or $300,000 in excess of her target, and a long-term equity award equating to $2.763 million, or $363,000 greater than her target, in part due to Cook's Touch More Loans strategy. In 2007, Cook received a bonus of $1.4 million dollars plus a supplemental bonus of $200,000 with a three-year vesting schedule, again in part because of Touch More Loans.

22. Cook was responsible for ensuring that Single Family's public disclosures were accurate. Cook was considered an expert on credit risk within Freddie Mac. Furthermore, during the Relevant Period, the Disclosure Committee consulted Cook at least once regarding the Company's public disclosures concerning subprime.

23. Cook signed sub-certifications directed to Syron and other senior executives for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007 and May 14, 2008, and for Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008. Each of Cook's sub-certifications covered the Company's subprime disclosures.

24. **Donald J. Bisenius**, age 53, was employed by Freddie Mac from 1992 through April 1, 2011, and held a number of titles, including Senior Vice President ("SVP") of Credit Policy and Portfolio Management from November 2003 to April 2008, SVP of Single Family

8

Credit Guarantee from May 2008 to May 2009 and, most recently, EVP of Single Family Credit Guarantee. Bisenius is a resident of Virginia.

25. In 2007 and 2008, Bisenius reported directly to Cook and was the senior-most officer for credit risk in Single Family during the periods covered by the Information Statement and Information Statement Supplements for the periods ended December 31, 2006, March 31 and June 30, 2007, the Information Statement Supplement for the period ended March 31, 2008, and the Form 10-Q for the period ended June 30, 2008. As the senior-most officer for credit risk in Single Family, Bisenius was recognized within Freddie Mac as an expert on single-family mortgages and on credit risk and was responsible for developing credit policies for Freddie Mac's guarantee of loans.

26. Between approximately March 2007 and April 2008, Bisenius also focused on certain "special projects," including a "Model Subprime Offering" discussed below in Paragraph 61, aimed at borrowers previously serviced by lenders who self-identified as subprime originators.

27. Bisenius signed sub-certifications for each Freddie Mac Information Statement and Information Statement Supplement published between March 23, 2007, and August 30, 2007, Freddie Mac's Information Statement Supplement published on May 14, 2008, and Freddie Mac's Form 10-Q filed with the Commission on August 6, 2008. Each of Bisenius' sub-certifications covered the Company's subprime disclosures. Bisenius also served on the Disclosure Committee that considered Freddie Mac's Information Statement Supplement for the period ended March 31, 2008, and its Form 10-Q for the period ended June 30, 2008.

### *Background*

28.    As described below, in or about June 2006, Freddie Mac began to quantify in its public disclosures the approximate amount of exposure to subprime loans in the Single Family guarantee business. During the Relevant Period, Freddie Mac provided various such estimates – ranging between $2 and $6 billion, or 0.1 to 0.2 percent of its Single Family guarantee business. In fact, during this period, Single Family had exposure to between approximately $140 billion and $244 billion of loans that Freddie Mac internally recognized were "subprime," "otherwise subprime" or "subprime-like." The misleading statements identified herein all relate to attempts by Freddie Mac and its senior executives, including defendants, to minimize and mislead investors concerning the exposure of Freddie Mac's Single Family guarantee business to subprime loans.

29.    Beginning with its Information Statement for the fiscal year ended December 31, 2003 (the "2003 Information Statement"), and continuing through the Relevant Period, Freddie Mac published tables of credit risk characteristics for Single Family loans (the "Credit Risk Tables"). Those Credit Risk Tables contain information describing risk characteristics such as original loan-to-value ("LTV") ratio bands, product type, property type, occupancy type, FICO credit score bands, loan purpose, geographic concentration, and origination year. The Credit Risk Tables did not quantify or otherwise provide estimates of Freddie Mac's exposure to subprime loans.

30.    In or about March 2007, as investor interest in the credit risk associated with subprime loans continued to increase, Freddie Mac began to provide narrative disclosure describing and estimating the exposure of its Single Family guarantee business to subprime

10

==loans. These disclosures contained blatantly false and misleading statements for the reasons described below.==

### *Since the 1990s, Freddie Mac Internally Categorized Loans As Subprime Or Subprime-Like As Part Of Its Loan Acquisition Programs <u>And In Connection With Monitoring The Risk Of Its Portfolios</u>*

31. As part of its loan acquisition and securitization process in the Single Family credit guarantee portfolio, Freddie Mac provided mortgage loan originators with a series of mortgage underwriting standards and/or automated underwriting software tools, including, since at least 1995, its proprietary automated underwriting system ("AUS") called "Loan Prospector."

32. Loan Prospector generated a credit risk classification for each loan and was used to determine the terms on which a loan could be sold to Freddie Mac, including whether a loan could be sold to Freddie Mac without certain representations and warranties or without additional cost.

33. During the Relevant Period, Loan Prospector generated a score that estimated the risk of default for each loan. The scores, in turn, were grouped into six bands or "grades," which roughly corresponded to the level of anticipated risk: A+, A1, A2, A3, C1 or C2. These grades were visible to Freddie Mac but not to mortgage loan originators or the public. Loans falling into the first four grades (A+, A1, A2 and A3) were designated "Accept Loans." Loans falling into the bottom two grades (C1 and C2) were designated "Caution Loans."

34. A loan designated as an Accept Loan permitted automated underwriting, reduced documentation and generally did not require originators to make special representations and warranties regarding the credit quality of the loan because Loan Prospector had already determined the loan was creditworthy.

35. By contrast, Loan Prospector's designation of a loan as a Caution Loan meant that the system had identified concerns about the loan's creditworthiness. Originators were required

manually to underwrite Caution Loans, produce additional documentation regarding the borrower's creditworthiness, and make special representations and warranties regarding the credit quality of the loan. Caution Loans had multiple higher risk characteristics, such as high LTV ratios, borrowers with lower FICO scores, unusual property types or high debt-to-income ratios, and were recognized within Freddie Mac as loans that had a high risk of default relative to Accept Loans. Internally at Freddie Mac, Caution Loans were considered to be equivalent to subprime.

36.     On October 8, 1997, Freddie Mac publicly announced the roll-out of its "A-minus Program" at the Mortgage Bankers Association's annual meeting in New York. "A-minus" was a term commonly used in the marketplace to refer to subprime loans. The next day, the *American Banker* published an article reporting on Freddie Mac's announcement and observed that "Freddie Mac is diving into subprime lending, ending months of speculation over how deeply the agency would go into the burgeoning market." Under the A-minus Program, Caution Loans that received a score of C1 in Loan Prospector could be sold to Freddie Mac on the same terms as an Accept Loan with the payment of an additional fee by the seller. As noted by the *American Banker* article, the A-minus Program was publicly perceived as expanding Freddie Mac's exposure to subprime loans.

37.     Sales and marketing materials prepared for Single Family as part of the roll-out of the A-minus Program advised the Company's sales force that "Freddie Mac is expanding the range of loans it will purchase, including many loans in the A-minus sector of the market. Now lenders can use Loan Prospector to provide less costly, more efficient financing to borrowers with weaker credit." In describing the A-minus sector of the housing market, the sales and

12

marketing materials stated that "A-minus loans account for approximately 50 percent of subprime loans."

38. In or about November 1998, in connection with the A-minus Program, Freddie Mac revised its Credit Policy Book as it related to the broader credit risk parameters and processes under which Freddie Mac was willing to guarantee loans in Single Family. The memorandum authorizing these revisions described mortgages eligible for the A-minus Program as "[m]ortgages that generally comprise the first and second tier of subprime lender risk grades" and "mortgages generally includ[ing] 54% to 56% of the subprime market." Mortgage loans that received a C1 rating in Loan Prospector were described as having a credit quality of "A-minus," and those that received a C2 rating in Loan Prospector were described as having a credit quality of "subprime." Bisenius signed and approved the revisions to the Credit Policy Book.

39. In or about 1999, at the request of Bisenius, Freddie Mac developed an econometric model called "Segmentor," which enhanced Loan Prospector's ability to identify subprime loans prior to Freddie Mac guaranteeing those loans. The model scored mortgage loans on a variety of credit risk characteristics, such as debt ratio, FICOs, and time since most recent foreclosure, and generated a "subprime score." If the Segmentor "subprime score" fell below certain thresholds or had certain characteristics such as a high debt-to-income ratio, the loan received an automatic rating of C1 or C2 in Loan Prospector.

40. Loan Prospector developed and evolved over time, but, the internal view that Caution Loans (C1 and C2) were synonymous with subprime or were "subprime-like" did not change.

41. Freddie Mac's exposure to Caution Loans up through the Relevant Period steadily rose. As of the end of 2004, Freddie Mac guaranteed the principal and interest on Caution Loans

13

in the amount of approximately $70 billion. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to Caution Loans from approximately $73 billion to $233 billion, with the largest annual increase between the fourth quarter of 2006 (approximately $138 billion) and the fourth quarter of 2007 (approximately $216 billion). While Caution Loans were internally referred to as subprime, they were not disclosed publicly as part of the Company's Single Family subprime exposure.

### *Freddie Mac Acquires Increasingly Risky Loans to Maintain Market Share*

42. In or about the early 2000s, Freddie Mac and the Federal National Mortgage Association ("Fannie Mae") began to lose market share in mortgage loan securitizations to new competitors, including Wall Street banks. Mortgage originations had shifted from traditional fixed-rate loans to higher risk loan products with features such as adjustable rates ("ARMs"), interest-only payments, and reduced documentation requirements.

43. By 2005, the Freddie Mac and Fannie Mae combined share of the market for mortgage securitizations had fallen to approximately 42 percent from a high of nearly 60 percent in 2000. Within that shrinking GSE share of the market, Freddie Mac also had been steadily losing market share to Fannie Mae. Freddie Mac responded to this loss of market share by broadening its credit risk parameters to purchase and guarantee increasingly risky mortgages in its Single Family guarantee portfolio between approximately 2004 and 2007.

44. For example, in or about late 2004, despite contrary advice from the Company's senior credit risk experts, Syron authorized Freddie Mac's continued purchases of a particularly risky type of mortgage commonly referred to in the industry as a "No Income, No Asset" loan or "NINA." NINAs were widely considered to be particularly risky because they did not require any verification of a borrower's income or assets. Freddie Mac's senior credit risk officers

14

advocated to Syron that the Company stop guaranteeing NINA mortgages, in part, because of the high risk of default associated with such mortgages within their first year and because of perceived reputation risk to the Company. Syron rejected the advice, in part due to his desire to improve Freddie Mac's market share.

45.     Another example of increased risk taking occurred in or about 2005, when the Company embarked on a business strategy called Touch More Loans. Touch More Loans was designed to gain back lost market share by granting exceptions to Freddie Mac's existing credit policy to permit the acquisition and guarantee of riskier loans that were being originated in the marketplace. Cook led the Touch More Loans strategy.

46.     Coinciding with the introduction of Touch More Loans, the Company embarked on two additional initiatives to expand market share:

a.     First, in February 2005, Freddie Mac introduced a new residential mortgage product called Home Possible, which was geared to low-to-moderate income borrowers (such as teachers, law enforcement personnel, healthcare workers and the military) and permitted lower down payments or higher loan-to-value ratios, among other higher credit risk characteristics, than had previously been allowed. Loans acquired through Home Possible were internally considered to be "subprime-like."

b.     Second, on August 17, 2005, Freddie Mac internally issued a policy statement authorizing increased guarantees of a Fannie Mae proprietary product called "Expanded Approval" (or "EA") loans. As of December 2004, Freddie Mac guaranteed the principal and interest on EA loans in the approximate amount of $69 million. From the first quarter of 2005 through the second quarter of 2008, Freddie Mac increased its total exposure to EA loans from approximately $1 billion to $11 billion (with the largest increase of

15

approximately $8 billion coming between the fourth quarter of 2006 and the fourth quarter of 2007). EA loans were considered to have, at best, credit risk equivalent to A-minus loans and were internally described in this policy statement as (1) "appear[ing] to be subprime in nature[;]" and (2) "high risk . . . since performance compares to subprime products." In fact, on August 20, 2007, in an email that was sent to Cook and others, Bisenius described EA loans as "clearly subprime."

47.     From 2005 forward, Freddie Mac also substantially increased its exposure to loans from a subprime lending division of Countrywide Financial Corporation ("Countrywide") known as Full Spectrum Lending. Between 1999 and 2004, Freddie Mac acquired loans from Countrywide's Full Spectrum Lending division in the aggregate amount of approximately $279 million. From 2005 through 2008, Freddie Mac acquired approximately $12 billion of Full Spectrum Lending loans (with the largest increase between 2006 (approximately $3 billion) and 2007 (approximately $6 billion)).

48.     The approximate aggregate amount (in billions of U.S. dollars), measured by unpaid principal balance, of C1, C2 and EA loans in Single Family at the end of the following periods was as follows:

| Single-Family Guarantee Portfolio | | | | | | |
|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 1Q05 | $1 | $39 | $35 | $74 | $75 | $1,220 | 6% |

16

| Single-Family Guarantee Portfolio | | | | | | |
|---|---|---|---|---|---|---|
| Period | EA | C1 | C2 | Total C1 and C2 | Total C1, C2 and EA | Total Single-Family Guarantee Portfolio | % Total C1, C2 and EA of Total Single-Family Guarantee Portfolio |
| 2Q05 | $1 | $42 | $37 | $79 | $80 | $1,244 | 6% |
| 3Q05 | $1 | $47 | $39 | $86 | $87 | $1,274 | 7% |
| 4Q05 | $2 | $53 | $42 | $95 | $97 | $1,318 | 7% |
| 1Q06 | $2 | $60 | $47 | $107 | $109 | $1,360 | 8% |
| 2Q06 | $2 | $64 | $50 | $114 | $116 | $1,387 | 8% |
| 3Q06 | $2 | $71 | $54 | $125 | $127 | $1,428 | 9% |
| 4Q06 | $3 | $78 | $60 | $138 | $141 | $1,467 | 10% |
| 1Q07 | $4 | $89 | $67 | $156 | $160 | $1,528 | 10% |
| 2Q07 | $6 | $100 | $77 | $177 | $183 | $1,586 | 12% |
| 3Q07 | $8 | $110 | $88 | $198 | $206 | $1,642 | 13% |
| 4Q07 | $11 | $118 | $98 | $216 | $227 | $1,692 | 13% |
| 1Q08 | $11 | $123 | $104 | $227 | $238 | $1,739 | 14% |
| 2Q08 | $11 | $127 | $106 | $233 | $244 | $1,784 | 14% |

*Freddie Mac's Acquisition and Guarantee Of*
*Loans From Other AUSs Increases its Subprime Exposure*

49.     Beginning in or about 2004, in addition to purchasing and guaranteeing the payment of principal and interest on loans that had been underwritten using Loan Prospector, Freddie Mac increasingly purchased and guaranteed mortgage loans underwritten through other proprietary AUSs.  For example, Freddie Mac purchased and guaranteed mortgage loans underwritten using AUSs such as Fannie Mae's Desktop Underwriter and Countrywide's CLUES.

50.     To assess the relative risk of mortgages underwritten through other AUSs, Freddie Mac used an internal modeling system called LP Emulator to approximate how the loans would have scored under Loan Prospector.  LP Emulator used the same scoring metric as Loan Prospector – Accept Loans (A+, A1, A2 and A3) and Caution Loans (C1 and C2) – but, LP Emulator was run on a loan after Freddie Mac had agreed to guarantee the loan.  Using LP Emulator, Freddie Mac could identify a loan that would have been designated as a Caution Loan if underwritten through Loan Prospector, but had instead been guaranteed on terms equivalent to an Accept Loan after being underwritten through another AUS.  Loans falling into this category were deemed to have a "defect."  Beginning in 2004, Freddie Mac tracked the "defect rate" of loans acquired through other AUSs.

51.     In the second quarter of 2003, before Freddie Mac increased its purchases through AUSs other than Loan Prospector, Freddie Mac's aggregate defect rate was approximately 1 percent.  Freddie Mac's purchase and guarantee of mortgages underwritten through other AUSs increased to the point where it was acquiring fewer loans through Loan Prospector (approximately 27 percent) than through Fannie Mae's Desktop Underwriter (approximately 31 percent).  The defect rate rose dramatically, and in August 2007, the aggregate defect rate

18

reached a historical high of approximately 22 percent. Approximately 22 percent of the loans Freddie Mac purchased and guaranteed that were underwritten through other AUSs therefore met the Freddie Mac internal definition of subprime.

### *Defendants Were Aware of Subprime Exposure in Single Family*

52. On May 25, 2006, Cook attended a meeting of the Board's Finance and Capital Deployment Committee. Prior to that meeting, she received a memorandum authored by the Company's then-Chief Enterprise Risk Officer, highlighting for her and the other attendees that "[t]he credit parameters of new single-family purchases continue to decline. In order to support our business strategies to increase customer focus, build market share and meet affordable goals, we continue to expand credit policies and increase purchases of higher-risk products."

53. Six days later, on May 31, 2006, Syron and Cook attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was highlighted that the Touch More Loans strategy had resulted in significantly greater credit risk to the Company. Specifically, a presentation made by a senior credit risk officer stated that, pursuant to Touch More Loans, Freddie Mac was "expanding our appetite" for, among other things, risk layering of lower FICOs, higher LTV's, other AUSs, and other high-risk loans. To the extent it was not already clear to them prior to the meeting, Syron and Cook also were informed that the Company was loosening its underwriting standards through its implementation of the Touch More Loans strategy by, among other things, increasing exceptions to the Company's existing credit policy – exceptions that had almost tripled between 2004 and 2005, from 286 in 2004 to 770 in 2005.

54. On November 30, 2006, Bisenius' staff informed him that loans sold to Freddie Mac through Fannie Mae's Desktop Underwriter were contributing disproportionately to the Company's increasing defect rate and included loans that were equivalent to subprime. Specifically, Bisenius' staff told him and others that loans from Fannie Mae's Desktop

Underwriter "have a much higher percent of defect loans, loans that are subprime-like, loans that have very low FICOs" in referring to loans that contributed to the increasing "defect rate" at the Company.

55.     On December 7, 2006, Syron and Cook attended a meeting of the Mission, Sourcing and Technology Committee of the Board of Directors. Attached to a presentation prepared for that meeting was a glossary of terms, the purpose of which was to inform the Board of how management used certain terms. The glossary defined "Subprime Mortgages" as follows:

> There is no longer a clear-cut distinction between prime and subprime mortgages as the mortgage market has evolved to provide for mortgage credit to a full range of borrowers with a variety of products and processes. Subprime mortgages generally are mortgages that involve elevated credit risk. Whereas prime loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, subprime loans are typically made to borrowers who have a blemished or weak credit history and/or a weaker capacity to repay.

Ultimately, during the Relevant Period, the Company's public subprime disclosures were inconsistent with how management characterized its use of the term "subprime" for its own Board members.

56.     Beginning on or about January 18, 2007, Freddie Mac's ERMC began to report on Freddie Mac's exposure to subprime loans. Attendees of the January 18 ERMC meeting – including Syron and Cook – were told that "[l]oan level risk grades are blurred as capital retreats in [the] subprime market, increasing the likelihood that we are already purchasing subprime loans under existing acquisition programs." Accordingly, this presentation reinforced to attendees of this meeting that it was likely that Freddie Mac already was purchasing loans with credit risk characteristics similar to loans originated by self-identified subprime originators, and that market participants would consider to be subprime loans. The ERMC met monthly after this

and Syron and Cook generally attended ERMC meetings. Going forward, the ERMC reports consistently contained this same warning. Syron typically received the ERMC reports in advance of the meetings and generally reviewed them prior to the meetings.

57.     On February 6 and 7, 2007, Syron gathered his Senior Executive Team for a two-day offsite planning meeting in Florida to discuss Freddie Mac's strategic direction. Cook attended as a member of the SET, as did Bisenius (who was invited even though he was not formally a member of the SET). At least one presentation was devoted to Freddie Mac's role in the subprime market. That presentation highlighted for attendees the following regarding Freddie Mac's exposure to subprime:

- Freddie Mac "already purchase[s] subprime-like loans . . . but with considerably lower fees[,]" which attendees generally understood meant that Freddie Mac was purchasing loans with credit risk and expected default rates similar to the loans originated by a small handful of institutions that self-identified as subprime originators.

- The "[w]orst 10% of [the Single Family] Flow Business" – which comprised approximately 70 percent of Single Family purchases in 2006 – were "subprime-like loans."

- Freddie Mac was purchasing greater percentages of "risk layer[ed]" loans, defined as loans consisting of total LTV greater than 90 percent and FICO scores less than 680, which was "leading to more 'Cautions'" and a higher "[d]efect rate."

- "'Caution' loans have greater default costs . . . resulting in higher expected losses[.]"

21

58.     On February 17, 2007, Syron received and responded to an email from Bisenius regarding a new "Subprime Project." Bisenius told Syron and others that an expanded role in the subprime market only made sense if Freddie Mac was adequately compensated for the risk, and reminded Syron and others that there were certain categories of loans, including "free cautions," that the Company already purchased and did not receive adequate compensation for the risk.

59.     On March 2 and 3, 2007, Syron, Cook and Bisenius attended a two-day Board of Directors meeting, a significant portion of which was dedicated to the Company's strategic direction in subprime.  Cook was one of the presenters at the Board meeting and she, along with the then-Chief Operating Officer, presented similar information to the Board as contained in the February 6 and 7 offsite meeting.  Specifically, Cook and the then-Chief Operating Officer led a discussion at the meeting concerning a slide in which the "worst 10% of [Freddie Mac's] Flow Business" was listed as an example of "subprime-like loans" the Company already purchased, and in which they conveyed:

- "We already purchase subprime-like loans to help achieve our HUD goals . . . [b]ut we receive considerably lower fees than subprime loans would fetch in the market."

- "Some of our current purchases have subprime-like risk[.]"

- "[F]ixed-rate subprime doesn't look all that different than the bottom of our purchases, with returns five to six times as great, not universal for all subprime."

60.     In addition to receiving at least the SET and Board materials referred to above in Paragraphs 57 and 59 which highlighted, among other things, that a material portion of the Single Family business was "subprime-like," and monthly ERMC reports which repeatedly warned of the increasing risk that Freddie Mac was buying subprime loans (and showed data

suggesting that the credit risk of the principal and interest of loans to be securitized by Freddie Mac was increasing to historic proportions), Syron also was aware at least as early as February 17, 2007 of Freddie Mac's efforts to develop a model subprime offering targeted at customers of self-identified subprime originators.

61.    By at least early April 2007, Bisenius transitioned into a new role at Freddie Mac, where he was placed in charge of developing a Model Subprime Offering that was later publicly known as a product called "Freddie Mac SafeStep Mortgages," to give subprime borrowers a more consumer-friendly mortgage option.

62.    Although the Model Subprime Offering purportedly had been developed as an alternative to subprime products, Freddie Mac personnel, including Syron, Cook and Bisenius, recognized that it actually competed with existing programs that Freddie Mac had internally recognized as "subprime," "otherwise subprime," or "subprime-like."

63.    On April 12, 2007, Bisenius proposed abolishing Freddie Mac's A-minus Program – which was long-recognized as subprime – "so as to not canabalize [sic] our [Model Subprime Offering]."

64.    By mid-April 2007, Bisenius also knew that the credit characteristics of loans to be guaranteed under the Model Subprime Offering were similar to those of other existing Freddie Mac programs in addition to the A-minus Program, such as Home Possible and Fannie Mae's EA program, which he was well aware internally were perceived as programs that exposed Freddie Mac to subprime or subprime-like loans – as he had used those same descriptions for those programs.

65.    Bisenius regularly briefed Cook on the Model Subprime Offering. Cook requested these briefings to discuss the role of the Company's existing Single Family guarantee

23

programs relative to the Model Subprime Offering. At a briefing on April 20, 2007, highlighted that there were "alignment" issues between the Model Subprime Offering loans and Freddie Mac's existing loan programs.

66.     On May 16, 2007, Bisenius sent an e-mail commenting on a set of recommendations regarding certain of Freddie Mac's current offerings as related to the Model Subprime Offering. In the email, Bisenius observed that the recommendations did not "address DU approves or Proprietary AUS approves that we think are subprime (ie., [sic] they would score Caution in LP) and therefore might compete with our model offering."

67.     On June 7, 2007, Cook and Bisenius attended a meeting of the Board's Mission, Sourcing and Technology Committee, where it was conveyed that:

- Certain higher risk loans sold to Freddie Mac through other AUSs were equivalent to subprime.

- Freddie Mac-securitized loans obtained through Fannie Mae's Desktop Underwriter had a "higher share of low FICO loans and subprime-like loans" relative to other AUS loans.

- Loans sold to Freddie Mac through Countrywide's CLUES were "particularly volatile" and, in particular, of those loans sourced through CLUES that were later scored by Freddie Mac's LP Emulator as "Caution," (called "defect loans" for their contributions to the "defect rate"), a high proportion of such loans were "subprime in nature."

68.     On or about June 11, 2007, Cook and others received an "Executive Summary" sponsored by Bisenius, that stated that the Model Subprime Offering would compete with existing loans the Company acquired and guaranteed such as "[Freddie Mac's] affordable

24

offerings like Home Possible and [Fannie Mae's] MyCommunityMortgage, as well as our LP Loan Prospector A-minus offering and [Fannie Mae's] newly revamped EA program." The Executive Summary also highlighted that "[s]ubprime mortgages are not considered unique in the industry. An analysis of Freddie Mac's existing products indicates our current A-minus offering has credit risk and product parameters (business terms) that match, and in some cases, are broader than those outlined in the proposed model Subprime offering." Cook attended the meeting of the New Products Committee where this Executive Summary was discussed.

69. At the September 25, 2007 ERMC meeting, both Syron and Cook were told that the defect rate of purchases, which had been steadily rising, had increased from approximately 13 percent at the end of June 2007, to 19 percent in July 2007, to approximately 22 percent in August 2007. The presentation highlighted for Syron and Cook that principal drivers of the defect rate were low FICOs and high LTVs. Syron and Cook were presented with similar facts at the October 23, 2007 ERMC meeting.

70. Additionally, on September 26, 2007, Cook received a memorandum describing how the Model Subprime Offering would be positioned for marketing purposes. The memorandum noted that the Model Subprime Offering was consistent with Freddie Mac's "longer term corporate 'touch more loans' strategy to expand into adjacent markets" and that the offering would replace Freddie Mac's A-minus loan program.

71. On November 27, 2007, the ERMC distributed a packet of materials to Syron and Cook, among others. Although no meeting took place, the materials further informed Syron and Cook of the stresses on Single Family as a result of Freddie Mac's acquisition of riskier loans. Specifically, the materials highlighted that the "2007 book performance is worse than in 2006, both exhibiting much higher serious delinquency rates than other book years;" that expected

25

default costs for October 2007 "are 76% higher than in 2006;" and that the defect rate had risen to approximately 20 percent.

72.     On December 18, 2007, Syron and Cook attended an ERMC meeting, which highlighted for them the deterioration of credit quality for the largest portion of Freddie Mac's Single Family guarantee portfolio. According to the report used at that meeting, the defect rate for the third quarter of 2007 had increased to approximately 20 percent, up from approximately 16 percent in the second quarter of 2007 and approximately 13 percent in the first quarter of 2007. Similar facts were highlighted for Syron and Cook at meetings of the ERMC on January 23, 2008

73.     On January 23, 2008, Syron and Cook attended another ERMC meeting, during which they were told that the defect rate on the largest part of the business was at approximately 20 percent in November, still at historically high levels. Syron and Cook also were told that EA loans accounted for approximately 19 percent of expected default costs in Single Family. Similar trends were highlighted for Syron and Cook at ERMC meetings on February 19, 2008, March 25, 2008 and April 29, 2008

### *Syron, Cook and Bisenius Were Responsible for Freddie Mac's Disclosures*

74.     Syron, Cook and Bisenius each made, or aided and abetted Freddie Mac or each other in making, false and misleading credit risk disclosures regarding subprime loans in the Company's Single Family guarantee portfolio as a result of their authority over, or knowing and substantial assistance in, such disclosures.

75.     As CEO of Freddie Mac, Syron certified the Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2006 (the "2006 Information Statement"), the Financial Report for the Three and Six months Ended June 30, 2007 (the "2Q07 Information Statement Supplement"), the Financial Report for the Three and Nine Months Ended

26

September 30, 2007 (the "3Q07 Information Statement Supplement"), the Information Statement and Annual Report to Stockholders for the Fiscal Year Ended December 31, 2007 (the "2007 Information Statement"), the Financial Report for the Three Months Ended March 31, 2008 (the "1Q08 Information Statement Supplement"), and the Form 10-Q for the Quarterly Period Ended June 30, 2008 (the "2Q08 Form 10-Q"). The certifications stated, among other things:

- "Based on my knowledge, this [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this [Report.]"

- "Based on my knowledge, the consolidated financial statements, and other financial information included in this [Report], fairly present in all material respects the financial condition, results of operations and cash flows of Freddie Mac as of, and for, the periods presented in this [Report]."

76. Cook sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement, the 3Q07 Information Statement Supplement, the 2007 Information Statement, the 1Q08 Information Statement Supplement, and 2Q08 Form 10-Q. Bisenius sub-certified the 2006 Information Statement, the 2Q07 Information Statement Supplement and the 2Q08 Form 10-Q. Those sub-certifications stated, among other things:

- "Based upon my role and responsibilities, I have reviewed the appropriate sections of the [Report]."

- "I have consulted with such members of my staff and others whom I thought should be consulted in connection with my execution of this attestation."

- "Based upon my role and responsibilities, but limited in all respects to the matters that come to my attention in fulfilling my responsibilities as [CBO (Cook) or SVP for Credit Policy (Bisenius)], I hereby certify to the best of my knowledge and belief that:"

- "The [Report] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, to not be misleading."

- "The financial statements and other financial information included in the [Report] fairly present, in all material respects, the financial condition and results of

27